148 So.2d 543 (1963)
Hubert HEVEY, Appellant,
v.
NEWS-JOURNAL CORPORATION, Julius Davidson, Herbert M. Davidson and Tippen Davidson, Appellees.
No. D-324.
District Court of Appeal of Florida. First District.
January 8, 1963.
Rehearing Denied January 31, 1963.
*544 Walter A. Shelley, Daytona Beach, for appellant.
Paul & Sams, Miami, for appellees.
STURGIS, Judge.
The plaintiff below, Hubert Hevey, appeals from a final judgment which dismissed with prejudice his complaint in an action for libel against News-Journal Corporation, Julius Davidson, Herbert M. Davidson, and Tippen Davidson, the alleged "owner", "publisher", "editor", and "executive editor", respectively, of the Daytona Beach Evening News and the Daytona Beach Morning Journal, newspapers of general circulation published daily except Sunday and distributed in Daytona Beach and elsewhere in the state of Florida.
Paragraph II of the complaint charges, in substance: That defendants maliciously caused to be printed and circulated in the November 16, 1960, issue of the Daytona Beach Evening News an article[1] containing *545 certain false, libelous and defamatory statements of and concerning the plaintiff in the following particulars:
"(a) Accused Hubert Hevey of `violating the Civil Service Act [referring to Chapter 29,003, Laws of Florida, Acts of 1953, constituting the Civil Service Act pertaining to the City of Daytona Beach, Florida] by coercion and intimidation.'
"(b) Stated `Hubert Hevey has obtained direct personal influence and control of a majority of the Board. * * *' [referring to the Civil Service Board of said city].
"(c) Pictured Hubert Hevey as `a menace to the City' [of Daytona Beach, Florida] `repressive to good government' and `a threat to the hundreds of city workers. * * *' [of said city]."
Paragraph III of the complaint charges that defendants maliciously caused to be printed and circulated in the November 17, 1960, issue of the Daytona Beach Morning Journal an editorial[2] containing certain *546 false, libelous and defamatory statements of and concerning the plaintiff in the following particulars:
"(a) [Daytona Beach] City Commissioner Hubert Hevey was accused of `virtual destruction of Civil Service [in said city] through its use as a political implement', which statement is false and malicious.
"(b) City Commissioner Hubert Hevey was accused of `packing' the Civil Service Board [of said city]. Labeled *547 his conduct `repressive to good government' and that it `creates a menace to the City [of Daytona Beach, Florida] and is a threat to the hundreds of city workers [of said city]'.
"(c) City Commissioner Hubert Hevey was accused by innuendo and inference of setting up a `political system' that he, as a political officer, `got votes through offering jobs' all of which is malicious, false, libelous and defamatory.
"(d) By innuendo and inference this publication charged that `the tax payers are being cheated by City Commissioner Hubert Hevey hiring incompetents for city jobs.'"
The complaint further charged that said publications were directed exclusively toward the plaintiff; that defendants published said article in the Daytona Beach Evening News with knowledge that the author of the letter referred to therein, a former chairman of the Civil Service Board of the City of Daytona Beach, Florida, was no longer a member of said board; and further charged that to the extent particularized by the Complaint, as above set forth, the statements attributed to Mr. Chase by the article appearing in the Daytona Beach Evening News, and those attributed to him by the editorial appearing in the Daytona Beach Morning Journal, related to matters occurring after Mr. Chase's former official connection with said Civil Service Board had been terminated.
The allegation that the publications in suit are directed exclusively against the plaintiff is refuted by a casual reading thereof. As to the plaintiff, however, a publication is none the less libelous when it is found to be critical of other persons as well.
The complaint charged that said publications are libelous per se in the above mentioned particulars on the independent grounds: (1) they impute to the plaintiff the commission of acts which, if true, would constitute a crime in violation of Chapter 29,003, Laws of Florida, Acts of 1953, and also a crime in violation of Section 28, Code of Daytona Beach, Florida; and (2) said statements, if true, impute to him the commission of acts that would subject him to removal from office as a member of the City Commission of the City of Daytona Beach, Florida; and (3) said statements fail to inform the reader that it required the action of a majority of the City Commission to constitute official action of said Civil Service Board; and (4) in that the editorial concludes with the following language:
"If the present Commission does not clean up the Civil Service mess, then the people should clean up the City Commission."
On the foregoing predicate, the complaint charges that plaintiff has suffered damage to his good name, credit, and reputation in his personal, professional and business life; and alleges that the plaintiff, in compliance with Chapter 770, Florida Statutes 1953, as amended, F.S.A. on a date prior to the filing of this suit served on defendants the notice as therein required, and that defendants failed and refused to publish a retraction of the allegedly libelous matter; and thereupon plaintiff demanded $250,000 compensatory and punitive damages.
Defendants jointly moved to dismiss the complaint and alternatively to strike certain portions of the complaint. The grounds of the motion to dismiss were: (1) that the complaint failed to state a cause of action, (2) that the notice pursuant to F.S. 770.01, F.S.A. did not specify with particularity the allegedly false and defamatory statements, and (3) that such notice was not served on defendants Julius Davidson, Herbert M. Davidson, or Tippen Davidson. Said motion was granted, but the judgment *548 appealed does not indicate upon which ground. For convenience we will discuss the grounds in inverse order.
As to the second and third grounds of the motion, we first note that Section 770.01, Florida Statutes, F.S.A., provides that "Before any civil action is brought for publication, in a newspaper * * * of a libel, the plaintiff shall * * * serve notice in writing on defendant, specifying the article, and the statements therein, which he alleges to be false and defamatory." The complaint specifically alleges that the plaintiff
"* * * in compliance with Chapter 770, Florida Statutes, 1953, as amended, did on the 21st day of November, A.D. 1960, personally serve upon Defendants the Notice required by law, * * * and Defendants, after receipt of said Notice, have failed, neglected and refused to print and publish a retraction of the aforesaid false, untrue, unfounded, scandalous, malicious, libelous and defamatory articles concerning this Plaintiff."
The notice, made a part of the complaint, is captioned "NOTICE", is addressed
 "TO: NEWS-JOURNAL CORPORATION
 JULIUS DAVIDSON, Publisher
 HERBERT M. DAVIDSON,
 Editor
 TIPPEN DAVIDSON, Executive
 Editor"
and the body thereof reads as follows:
"A civil action for damages for libel and slander will be brought against you, or such of you as may be legally responsible in the Circuit Court, in and for Volusia County, Florida, after five days from the date of the service of the Notice for publication in the DAYTONA BEACH EVENING NEWS, all editions thereof, on the 16th day of November, A.D. 1960, in the following particulars, to-wit:
"(a) You have in a malicious, libelous, false and defamatory manner accused HUBERT HEVEY of `violating the Civil Service Act by coercion and intimidation'.
"(b) You have in a malicious, libelous, false and defamatory manner stated `HUBERT HEVEY has obtained direct personal influence and control of a majority of the Board. * * *'
"(c) You have in a malicious, libelous, false and defamatory manner pictured HUBERT HEVEY as `a menace to the City' `repressive to good government' and `a threat to the hundreds of city workers. * * *'
"AND FURTHER, for the publication in the DAYTONA BEACH MORNING JOURNAL on the 17th day of November, A.D. 1960, in an editorial entitled `CLEAN UP CIVIL SERVICE MESS!'
"HUBERT HEVEY was falsely and maliciously libeled and slandered in the following particulars, to-wit:
"(a) HUBERT HEVEY was accused of `virtual destruction of Civil Service through its use as a political implement' which statement is false and malicious.
"(b) Falsely and maliciously accused HUBERT HEVEY of `packing' the Civil Service Board. Labeled it `represssive to good government' and `creates a menace to the City and is a threat to the hundreds of city workers'.
"(c) By innuendo and inference this editorial accused HUBERT HEVEY of setting up a `political system' that he, as a political officer, `got votes through offering jobs' all of which is malicious, false, libelous and defamatory.
"(d) By malicious, false and defamatory innuendo and inference this publication accused HUBERT HEVEY of hiring incompetents that `the tax payers are being cheated'.

*549 "(e) Falsely, maliciously and libelously accused Hubert Hevey of `using Civil Service as a tool of personal power. * * *'
"The above publications, the words, statements and sentences therein, the import, insinuations and innuendos thereof, are severally and as a whole, false, libelous, slanderous and defamatory.
"THIS NOTICE is given you, jointly and severally, for the purpose of complying with Chapter 770, Florida Statutes, 1953, as amended, and the applicable law.
"You will please govern yourselves accordingly.
"Dated at Daytona Beach, Volusia County, Florida, this 21st day of November, A.D. 1960."
Appended thereto is a copy of a so-called certificate signed by plaintiff[3] indicating that service of the notice was made on the defendant News-Journal Corporation, and as it does not reflect service of the notice upon the other defendants, they insist that the complaint should be construed as affirmatively indicating that service of the notice was not made on them. We do not agree with that contention. It is seen that F.S. § 770.01 F.S.A., supra, required the plaintiff to perform certain acts as a condition precedent to the right to maintain the action, and performance must be pleaded by the plaintiff in order to state a cause of action. Williams v. City of Fernandina (1939), 138 Fla. 418, 189 So. 830. Where, as in this case, facts making up the ultimate fact are alleged, the defendant is entitled to rely thereon as being full and complete and by appropriate pleadings to take such action in the light thereof as he may be advised; hence the sufficiency of the alleged compliance with the statute was put to test by the second and third grounds of defendants' motion to dismiss, supra. The complaint unequivocally charges that plaintiff personally served upon defendants the notice required by law, and by reference incorporates the notice referred to. The "certificate" appended to the notice is not required by the statute, and is at best a self-serving declaration of the plaintiff. The quoted allegation of the complaint is construed as charging that the body of the notice was served on each defendant and that, if true, satisfies the statute. Whether the plaintiff is entitled to maintain this action against defendants Julius Davidson, Herbert M. Davidson, and Tippen Davidson, or either, depends upon the future pleadings and proofs.
We now turn to the question presented by the second ground of the motion to dismiss, that is, whether the mentioned notice meets the statutory requirement by "specifying the article, and the statements therein [in the publication]," which the plaintiff alleges to be false and defamatory. In Adams v. News-Journal Corporation (Fla. 1956), 84 So.2d 549, 553, the Florida Supreme Court held that in order to meet the requirements of F.S. 770.01, F.S.A. the notice should specify with particularity the statements in the offensive article which are alleged to be false and defamatory. See also, Walsh v. Miami Herald Publishing Co. (Fla. 1955), 80 So.2d 669. The notice herein falls short of that test as to the alleged libelous publication appearing in the Daytona Beach Evening News, issue of November 16, 1960. It does not specifically identify the article in that paper in which is published the alleged false and defamatory statements, and such failure precludes the plaintiff from maintaining this action to recover damages in that behalf. As we will further discuss, the notice is sufficient, however, to the extent that it relates *550 to the publication of the alleged libel in the November 17, 1960, issue of the Daytona Beach Morning Journal, and the complaint is susceptible, of course, to such further pleadings by way of amendment, or otherwise, as may be necessary to effectuate the conclusions herein expressed.
We come now to a discussion of the first ground of the motion to dismiss, which challenges the sufficiency of the complaint to state a cause of action, and for that purpose the motion admits as true all allegations that are well pleaded. We repeat our conclusion that the complaint states a cause of action for libel against the several defendants in respect to the publication appearing in the November 17, 1960, issue of the Daytona Beach Morning Journal.
A publication is libelous per se if, inter alia, it imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office. Miami Herald Publishing Co. v. Brautigam (Fla.), 127 So.2d 718, decided by the Third District Court of Appeal March 9, 1961, cer. den. by the Supreme Court of Florida, 135 So.2d 741, cer. den. by the United States Supreme Court, 369 U.S. 821, 82 S.Ct. 828, 7 L.Ed.2d 786, is the last expression of our courts on the question as to what type of newspaper publication constitutes actionable libel of a public official. See also, Teare v. Local Union No. 295 (Fla.), 98 So.2d 79. The applicable rule is clearly stated in the Brautigam case:
"The press, while guaranteed the right to publish the truth supported by good motives, has no right to publish falsehoods to the injury of others. A high degree of care is required by law to be exercised by newspaper publishers to avoid the commission of wrongs in the publication of false articles or news of a personal nature concerning which the publisher holds himself or his agents out as author and composer. * * *
"The great majority of American courts hold that no comment can be fair if it is based on misstatements of fact. See Noel, `Defamation of Public Officers and Candidates,' 49 Colum.L.Rev. 875, 896. We concur in this view and align ourselves with the majority. * *
"It is our opinion that the better view supports the holding that the defense does not embrace the right to falsely impute one's motives, want of loyalty or misconduct in office. See State ex rel. Arnold v. Chase, supra [94 Fla. 1071, 114 So. 856]; Jones v. Townsend's Administratrix, supra [21 Fla. 431]; and McClellan v. L'Engle, 74 Fla. 581, 77 So. 270. To excuse such an attack, the critic must show the truth of what he has uttered. This, of course, does not include those instances described in Rathkopf v. Walker, supra [190 Misc. 168, 73 N.Y.S.2d 117], as `mere exaggeration, slight irony, or wit, or all those delightful touches of style which go to make an article readable, do not push beyond the limitation of fair comment. Facts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch by his piquant pen.'"
And as said by our Supreme Court in Loeb v. Geronemus (Fla. 1953), 66 So.2d 241, 245:
"In determining the basic question of whether certain language is defamatory, so as to give rise to an action for slander, the words used `are not to be construed or taken in their mildest or most grievous sense, but in that sense in which they may be understood and in which they appear to have been used and according to the ideas which they were adopted to convey to those who hear them or to whom they are addressed.' Budd v. J.Y. Gooch Co., 157 Fla. 716, 27 So.2d 72, 74. The publication made should be construed as the common mind would understand it. Cooper v. Miami Herald Pub. Co., 159 *551 Fla. 296, 31 So.2d 382; Richard v. Gray, Fla., 62 So.2d 597; Sharp v. Bussey, 137 Fla. 96, 187 So. 779, 121 A.L.R. 1148."
We will endeavor to interpret the editorial in suit "as the common mind would understand it." The caption and the first two paragraphs are as follows:
"CLEAN UP CIVIL SERVICE MESS!
"THE CITY COMMISSION yesterday received a potent challenge to halt the virtual destruction of Civil Service in Daytona Beach through its use as a political implement.
"The challenge was hurled in a letter to the Commission by a man who knows what he is talking about. Frank Chase served as chairman of the Civil Service Board and was a member for over two years. As he says in his letter, he resigned because the `political platitudes' of city officials bothered him to such an extent that it affected his health."
There is nothing libelous in the above quoted phraseology. It does refer to one Frank Chase and his former official position as "chairman of the Civil Service Board" and quotes from a letter written by him. This reference affords the basis for consideration, in conjunction with the entire editorial, of the alleged article which appeared in the January 16, 1960, issue of the Daytona Beach Evening News and in which the letter referred to is mentioned.
The third paragraph of the editorial asserts that the resignation of Mr. Chase "opened the way for the appointment of another of the `associates, clients or political workers' of Commissioner Hevey  an appointment which Chase charges is in violation of the Civil Service Act." The fourth paragraph reads:
"Replacing Chase on the board was Leonard Grasso, a school teacher and a signer of the reelection petition of the man who appointed him, Commissioner Hevey. Chase says that as a person `holding a position of public trust,' Grasso is ineligible to serve on the board, but no Commissioner ever has questioned the appointment."
There is nothing in the above quoted portions of the editorial which, standing alone, would constitute a libel. The reference to "violation of the Civil Service Act" resulting from the appointment by the City Commission to the Civil Service Board of a person who is an associate, client, or political worker of Commissioner Hevey may be politically obnoxious and therefore the subject of fair comment, but even if erroneous, is not in itself libelous to Mr. Hevey's person. As said by Mr. Justice Terrell, speaking for the Florida Supreme Court in Kennett v. Barber, 159 Fla. 81, 31 So.2d 44, 46:
"We think the rule is now generally accepted that any one who seeks public employment or public office or who makes his living by dealing with the public or otherwise seeks public patronage, submits his private character to the scrutiny of those whose patronage he implores, and that they may determine whether it squares with such a standard of integrity and correct morals as warrants their approval."
A high degree of care is required to be exercised by newspaper publishers, however, to avoid the commission of wrongs in the publication of false articles or news of a personal nature concerning which the publisher holds himself or his agents out as author and composer. Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 86 A.L.R. 466; Miami Herald Pub. Co. v. Brautigam (Fla.), 127 So.2d 718. And with that principle in mind we address our attention to the remainder of the editorial, the fifth, sixth, seventh, and eighth paragraphs of which read:
"Grasso is one of those referred to in Chase's letter when he wrote:
"`The selection of  or packing of  a majority of board members by one *552 Commissioner is wrong  dead wrong. It is repressive to good government. It creates a menace to the city and is a threat to the hundreds of city workers who must look to Civil Service for job security and protection from political pressure.'
* * * * * *
"IN ADDITION to this clear definition of how `dead wrong' is the packing of a Civil Service Board by one man is the danger of the board's being used as a political patronage device. If the board is `packed' with one Commissioner's appointees, then it well could do his bidding on job appointments. Under the political patronage system, which Civil Service was formed to destroy, a political office holder got votes through offering jobs to those who worked to further his political career.
"This also is repressive to good government. Political job appointees need not be qualified people. They can be complete incompetents. Such workers on a government payroll cost far more money than do ones properly qualified, and who have passed tests to prove it. Waste of government funds on unqualified employes means that the taxpayers are being cheated.
"As Chase said, this is a `menace' to the city. It is a threat that job assignment in Daytona Beach can degenerate to the old political patronage system, and the taxpayers cheated of their just right to efficiency in government employment."
In its denouncement of Commissioner Hevey the editorial adopts as its own the language employed by former commissioner Chase. It tells its readers that Hevey is guilty of "packing" the Civil Service Board with his own appointees, an act as to which the courts take judicial notice that he, as one member of the City Commission, is incapable of performing alone. It inferentially accuses him of cheating the taxpayers by wasting "government funds on unqualified employes" thus appointed. As used in the context of the editorial, the word "cheat" denotes a deceitful practice designed to defraud or endeavor to defraud the taxpayers of their known rights, by the wilful device of Commissioner Hevey in "packing" the Civil Service Board with his appointees, contrary to plain rules of common decency. And the word "packing", as used in the editorial, must necessarily be construed as a process designed to deceive by false appearance, to counterfeit, to delude, to put together in sorts with a fraudulent design. These are not the sort of apparel worn by an honest man and the language employed, as understood "by the common mind", bears the clear inference that the things attributed to Commissioner Hevey dump him in the category of dishonest men.
The editorial goes on to state as a fact that one Norman Stabell, who succeeded Chase as chairman of the Civil Service Board, procured the resignation of one W.W. Colby as executive secretary of the board by deceitfully informing Colby that the board had agreed unanimously that he should resign; and states as a fact that Stabell actually wanted Colby's resignation so he could give the job to a friend, and by the mentioned ruse "fired" Colby the morning he [Stabell] moved up as chairman. The editorial concludes:
"But how did he manage such a fast action purge? He did it in cooperation with the other two board members who were serving at the pleasure of one City Commissioner, Hubert Hevey  Grasso and Harvey Altes. He did it because he, Stabell, is associated closely with Hevey. The combination of close friendship with a City Commissioner and cooperation of that Commissioner's other appointees made the task of using Civil Service as a tool of personal power quite easy.
* * * * * *
"THE CHALLENGE to the City Commission which Chase has issued *553 must be accepted. The destruction of Civil Service in Daytona Beach must be halted. The weakness of the present Commission majority in letting one member `pack' the Civil Service Board also is repressive to good government  if that majority will allow the destruction of Civil Service then the city can't expect constructive actions by the Commission in other realms either.
"If the challenge of Chase is avoided by the Commission, then the public must take it over. The people can act when they go to the polls in a few weeks to select those who are to serve as Commissioners for the next two years. If the present Commission does not clear up the Civil Service mess, then the people should clean up the City Commission."
The complaint herein is predicated on the premise that the language complained of is actionable per se. In our opinion the hereinabove quoted subparagraphs (a), (b) and (c) of Paragraph III of the complaint, when tested in the light of the editorial to which they refer, do not independently or collectively have the connotation attributed to them, that is to say, the editorial is not libelous per se in those particulars. As to subparagraph (a), the charge that the editorial accused the plaintiff of virtual destruction of Civil Service through its use as a "political implement" is entirely too vague, nebulous and innocuous to constitute a basis for libel per se, and the same observation applies to the generalization concerning "virtual destruction" of Civil Service. The same deficiencies recur in subparagraphs (b) and (c).
Construing the editorial as a whole, however, we conclude that it is actionable per se in the particulars specified by quoted subparagraph (d) of Paragraph III in that by clear innuendo and inference it charges that the plaintiff is cheating the taxpayers by hiring incompetents for city jobs.
It would require an elaborate and doubtless inconclusive dissertation on semantics to attempt an exploration of the various inferences and implications available to the common mind in an effort to understand the editorial in question. Suffice it to say that applying the within stated principles of law to which we adhere, we hold that the editorial is actionable per se as herein indicated and that plaintiff has alleged facts which, if true, constitute compliance with the statutory conditions precedent to the right to maintain this cause of action.
Accordingly, the judgment appealed is reversed and the cause is remanded for proceedings consistent herewith.
Reversed and remanded.
WIGGINTON, Acting C.J., and RAWLS, J., concur.
NOTES
[1] The text of the article appearing in the November 16, 1960, issues of the Daytona Beach Evening News is as follows:

"CHARGES CITY ADMINISTRATION VIOLATING CIVIL SERVICE ACT BY COERCION, INTIMIDATION
"A former Civil Service Board chairman today accused the city administration of `openly violating the Civil Service Act by directives, coercion or intimidation.'
"In a formal letter to the City Commission, Frank Chase contended that `every conceivable effort is being made to circumvent the Civil Service law.'
"He said City Commissioner Hubert Hevey has obtained direct personal influence or control over a majority of the board members by appointing `three of his business associates, clients or political workers' to the five member body.
"Chase was Civil Service chairman from July, 1958, to September of this year.
"Wrote Chase:
"`The selection of  or packing of a majority of board members by one Commissioner is wrong  dead wrong. It is repressive to good government. It creates a menace to the city and is a threat to the hundreds of city workers who must look to Civil Service for job security and protection from political pressure.'
"He called for the resignation of one of Hevey's appointees, current Board Chairman Norman Stabell.
"He asked for a legal opinion on the right of another Hevey appointee, Leonard Grasso, to serve on the board.
"Stabell recently `fired' Civil Service Executive Secretary W.W. Colby and hired a personal friend as a replacement.
"The move had been approved informally by Grasso and Harvey Altes, the third Hevey appointee. It was rescinded in an emergency meeting a few days later after protests by the other two members, Alfred A. Green, Jr. and W.L. Hancock.
"Stabell had represented the `firing' to Colby as a unanimous wish of the board.
"`The damning falsity of the chairman in his abominable scheme for the removal of the secretary and the hiring of a nonqualified replacement should be followed by his immediate resignation,' Chase wrote.
"Grasso is a public school teacher, which Chase maintains is an office of public trust under the state government. The Civil Service Act prohibits persons holding such office from serving on the board.
"City officials circumvent Civil Service law by requesting provisional appointments for `appointees of their personal or political interest,' Chase charged.
"He said little is known about the background of such employes until the Civil Service Secretary has an opportunity to investigate them.
"The former board chairman, a retired railroad executive, went on to write:
"`In an effort to control the Civil Service Board and the secretary, the administration substituted a greatly reduced budget for the year 1959-60. This budget didn't permit the legal operating expense of the secretary's office. This action in the administrative office was in direct violation of the Civil Service Act.'
"Chase cited as another example of `gross interference' the City Manager's recent refusal to issue an expense check for Civil Service Secretary Colby to attend a nationwide conference in New York City.
"The secretary had been instructed to attend the conference in a unanimously adopted motion of the board, Chase said.
"`Without respect for the board's directive  and without notice to the board  instructions were issued by the City Manager's office to the finance office not to issue the necessary voucher to cover the secretary's travel and expense,' Chase asserted.
"He then cited the case of Mrs. Rocco Acquaro, who quit without notice Nov. 10 as secretary to the city engineer and Board of Zoning Appeals. She charged A.M. Deatherage, city personnel director, wielded political influence over the Civil Service Board.
"She said Deatherage  telling her both were warranted  promised her a new job status and a pay raise a year and a half ago in return for her withdrawal from the list of candidates eligible for the job of secretary to the City Clerk. This enabled the Civil Service Board to remove the job from Civil Service jurisdiction, leaving it to be filled without a competitive examination.
"But Mrs. Acquaro's own job was never reclassified. The matter was brought before the City Commission, which recommended reclassification, but the Civil Service Board deferred action on the recommendation three times.
"The last time was Nov. 9. Deatherage appeared before the board to argue against the upgrading, and Mrs. Acquaro resigned the next day.
"`The promise of upgrading the position held by Mrs. Acquaro with increased salary was not made in good faith,' Chase maintained.
"He continued: `I have outlined some of the instances of interference that are a matter of record. There are many more. To stop these practices, the city administrative officers should be censured and instructed that further interference with Civil Service matters will not be tolerated.'
"Chase suggested that the City Attorney be asked to rule on whether the City Manager `has a right to interfere with the lawful duties of the Civil Service Board' or to change a budget adopted by the board in conformity with the law, whether the City Manager has a right to issue orders conflicting with actions of the board and whether a public school teacher legally can serve on the board.
"The writer also proposed that, `to avoid the balance of power held over the Civil Service Board by any one (City) Commissioner,' each Commissioner choose an appointee from his district in turn when filling future vacancies. That would give the board a member from each Commission District, he said.
"`Civil Service should properly be one of the major issues of the coming city elections,' he wrote."
[2] The text of the editorial appearing in the November 17, 1960, Daytona Beach Morning Journal is as follows:

"CLEAN UP CIVIL SERVICE MESS!
"THE CITY COMMISSION yesterday received a potent challenge to halt the virtual destruction of Civil Service in Daytona Beach through its use as a political implement.
"The challenge was hurled in a letter to the Commission by a man who knows what he is talking about. Frank Chase served as chairman of the Civil Service Board and was a member for over two years. As he says in his letter, he resigned because the `political platitudes' of city officials bothered him to such an extent that it affected his health.
"Before he gave up the fight to retain the integrity of the Civil Service Act, he saw many instances of its abuse, as his letter outlined. His very resignation paved the way for still another abuse  a repetition of one that had occurred before. It opened the way for the appointment of another of the `associates, clients or political workers' of Commissioner Hevey  an appointment which Chase charges is in violation of the Civil Service Act.
"Replacing Chase on the board was Leonard Grasso, a school teacher and a signer of the reelection petition of the man who appointed him, Commissioner Hevey. Chase says that as a person `holding a position of public trust,' Grasso is ineligible to serve on the board, but no Commissioner ever has questioned the appointment.
"Grasso is one of those referred to in Chase's letter when he wrote:
"`The selection of  or packing of  a majority of board members by one Commissioner is wrong  lead wrong. It is repressive to good government. It creates a meanace to the city and is a threat to the hundreds of city workers who must look to Civil Service for job security and protection from political pressure.'
* * * * *
"IN ADDITION to this clear definition of how `dead wrong' is the packing of a Civil Service Board by one man is the danger of the board's being used as a political patronage device. If the board is `packed' with one Commissioner's appointees, then it well could do his bidding on job appointments. Under the political patronage system, which Civil Service was formed to destroy, a political office holder got votes through offering jobs to those who worked to further his political career.
"This also is repressive to good government. Political job appointees need not be qualified people. They can be complete incompetents. Such workers on a government payroll cost far more money than do ones properly qualified, and who have passed tests to prove it. Waste of government funds on unqualified employes means that the taxpayers are being cheated.
"As Chase said, this is a `menace' to the city. It is a threat that job assignment in Daytona Beach can degenerate to the old political patronage system, and the taxpayers cheated of their just right to efficiency in government employment.
* * * * *
"ALREADY WELL PUBLICIZED before receipt of the Chase letter at City Hall was the attempted firing of W.W. Colby as executive secretary last month. In that abortive effort, Norman Stabell, who just had moved up as chairman of the board, obtained the resignation of Colby allegedly by telling him that the board had agreed unamimously he should resign. As it turned out, Stabell wanted Colby's resignation so he could give the job to a friend, so the morning after he moved up as chairman, he `fired' Colby.
"But how did he manage such a fast action purge? He did it in co-operation with the other two board members who were serving at the pleasure of one City Commissioner, Hubert Hevey  Grasso and Harvey Altes. He did it because he, Stabell is associated closely with Hevey. The combination of close friendship with a City Commissioner and co-operation of that Commissioner's other appointees made the task of using Civil Service as a tool of personal power quite easy.
* * * * *
"THE CHALLENGE to the City Commission which Chase has issued must be accepted. The destruction of Civil Service in Daytona Beach must be halted. The weakness of the present Commission majority in letting one member `pack' the Civil Service Board also is repressive to good government  if that majority will allow the destruction of Civil Service then the city can't expect constructive actions by the Commission in other realms either.
"If the challenge of Chase is avoided by the Commission, then the public must take it over. The people can act when they go to the polls in a few weeks to select those who are to serve as Commissioners for the next two years. If the present Commission does not clean up the Civil Service mess, then the people should clean up the City Commission."
[3] The "certificate" reads:

"I HEREBY CERTIFY that a copy of said Notice was personally served on News-Journal Corporation by delivery of copy to Tippen Davidson, Executive Editor on the 21st day of November, A.D. 1960.
 "Hubert H. Hevey, Jr."