JOHN H. LAYNE, *Plaintiff in Error,* v. THE TRIBUNE COMPANY, a corporation, *Defendant in Error.*

146 So. 234.

En Banc.

Opinion Filed February 3, 1933.

178

*Hampton, Bull & Crom,* for Plaintiff in Error;

*McKay, Withers & Ramsey,* for Defendant in Error.

DAVIS, C. J.—On February 19, 1932, the plaintiff in error, who will hereinafter be referred to as the plaintiff, brought an action at law against the defendant in error, The Tribune Company, as the publisher of a daily newspaper called The Tampa Morning Tribune, which will hereinafter be referred to as defendant, to recover $15,000.00 damages against the defendant for alleged publication in said newspaper of two press dispatches, both emanating from Washington, D. C., the one having been sent out by the Associated Press on June 30, 1930, and the other having been sent out by Universal Service on July 7, 1930.

The publication which forms the basis of the first count of plaintiff's declaration, reads as follows:

" 'WASHINGTON, June 30.—(AP)—Justice Gordon of District of Columbia supreme court today sustained the demurrer of Representative Dennison, of Illinois, to an indictment for possession of whiskey, holding that the charge was phrased in too general terms.

" 'The action virtually was equivalent to dismissal of the indictment.

" 'Dennison and his former secretary were indicted after prohibition agents had charged they found trunks containing liquor had been delivered to his office in the House office building.' "

The publication declared upon in the second count of the declaration is in the following language:

" 'WASHINGTON, July 7.—(Universal Service).—An appeal may be taken from Justice Peyton Gordon's decision sustaining a demurrer to the indictment of Rep. Edward E.

Dennison, republican, of Illinois, charged with illegal possession of liquor, it was indicated today.

" 'District Attorney Rover announced he will ask Solicitor General Thatcher to sanction an appeal to the District of Columbia court of appeals.

" 'Judge Gordon dismissed the case on the ground that the indictment, eight lines in length, did not meet the constitutional requirements that a defendant be advised with particularity of the charge against him so that he may prepare a defense.

" 'Dennison, a dry, was indicted last Nov. 19, after a trunk said to have contained liquor, was found in his office in the House office building. A 'leaky' suitcase consigned to his office was found at Union Station. John Layne, described as his secretary, was indicted with Dennison.' "

The original declaration was demurred to, and the demurrer sustained, whereupon the plaintiff filed an amended declaration. A demurrer was filed to both counts of this amended declaration. The demurrer came on for argument on June 11, 1932; the Judge of the lower court sustained the demurrer as to both counts of said amended declaration, and the plaintiff having announced that he did not desire to further amend his declaration, final judgment on demurrer was entered by the court against the plaintiff. It is from that final judgment that this writ of error has been sued out.

Libel *per se* may be defined as the false and unprivileged publication by letter, newspaper or other form of writing, of unfounded statements or charges which expose a person to hatred, distrust, contempt, ridicule or obloquy, or which tend to cause such person to be avoided, or which have a tendency to injure such person in his office, occupation, business or employment, and which are such that in their

*natural and proximate* consequence, will *necessarily* cause injury to the person concerned, in his personal, social, official or business relations of life, so that legal injury may be presumed or implied from the bare fact of the publication itself.   Briggs v. Brown, 55 Fla. 417, 46 Sou. Rep. 325.

Ordinarily it is regarded as libel *per se* to falsely publish of and concerning another a statement that he has been indicted for a criminal offense involving the element of disgrace or moral turpitude.   Posnett v. Marble, 62 Vt. 481, 20 Atl. Rep. 813, 22 A. R. S. 126, 11 L. R. A. 162; Kelley v. Flaherty, 16 R. I. 234, 14 Atl. 876, 27 A. S. R. 739. But this rule proceeds from the idea that the injurious character of such a publication is a fact of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect.

Consequently the publication of a libel *per se* is such that, in the eyes of the law, its publication *per se* necessarily imports injury, and thereby obviates the necessity of either pleading or proving damage or malice in fact, since both of these elements are presumed as a matter of law in such cases.   Abraham v. Baldwin, 52 Fla. 151, 42 Sou. Rep. 591, 10 L. R. A. (N. S.) 1051, 10 Ann. Cas. 1148.

The law has always made a distinction between false imputations that may be actionable in themselves, or *per se*, and those that may be actionable only on allegation and proof of special damage, or *per quod*.   Words of both classes are actionable on the same grounds and for the same reasons.   But a distinction between the two is based on a rule of evidence.   The noxious quality in both lies in the fact that they are the natural and proximate causes of pecuniary damage to those concerning whom such words are maliciously written.   The essential difference between the two lies in the matter of proof of the resulting injury.

In the case of words actionable *per se* their injurious character is a fact of common notoriety, established by the general consent of men, and the courts consequently take judicial notice of it. Words amounting to libel *per se* necessarily import damage and malice in legal contemplation, so these elements need not be pleaded or proved, as they are conclusively presumed as a matter of law in such cases. Notes 12 Am. Dec. 39, 9 Eng. Rul. Cases 11, 17, R. C. L. 264.

But words or publications actionable only *per quod* are those whose injurious effect must be established by due allegation and proof. In determining their actionable nature the courts must, unless controlled by some settled precedent, decide in accordance with the general and fixed current of opinion of the locality of publication as to the damaging effect of the charge contained or suggested in the words used. Because of this, judicial decisions of the past are so apt to vary with the social and moral views of the different jurisdictions, that in cases where the utterances or publications of the defendant are not clearly actionable *per se,* the surrounding circumstances and conditions must be taken into account to determine the matter. Note 12 Am. Dec. 39; Cole v. Millspaugh, 111 Minn. 159, 126 N. W. 626, 137 A. S. R. 546; note 20 Ann. Cas. 717, 28 L. R. A. (N. S.) 152.

*Innuendoes* in the pleadings are, however, ineffective for the purpose of fixing the character of an alleged libelous publication as being libelous *per se*. In determining whether or not a publication is libelous *per se* the language of the publication itself can alone be looked to, without the aid of *innuendoes,* since the innuendo in libel cases is but the deduction of the pleader from the words used in the publication. Unless the pleader's deduction is supported by the language of the publication, the actionable quality of the publication

is not legally disclosed. Wofford v. Meek, 129 Ala. 349, 30 Sou. Rep. 625, 87 A. S. R. 66, 55 L. R. S. 214.

The allegations of both counts of the amended declaration in this case show that the alleged false publication was made in a daily newspaper of general circulation. What everybody knows the courts are assumed to know, and of such matters may take judicial cognizance. St. Lucie Bk. & Tr. Co. v. Aylin, 94 Fla. 528, 114 Sou. Rep. 438. We therefore judicially know that since the publication complained of was by a daily newspaper, that such publication occurred in the course of the newspaper's reproducing for the benefit of its local readers, the news gathered from all parts of the world by such recognized news gathering agencies as the Associated Press, Universal Press, and the life.

As a corollary to the foregoing proposition, the courts can, and must, take judicial notice of the fact that in printing an associated press, or other press service dispatch, of a purported news happening, emanating from other places or localities, the article or news item, as reproduced and published locally, is not considered as the original or voluntary composition of the newspaper publisher, who merely reproduces it in his daily news columns in the form in which it has been received, but is rather regarded by the public as a mere repetition of a publication that has already been made by its real authors in their course of disseminating the news.

Those are numerous authorities, most of them of early date, which are to the effect that one who hears a slander has a legal right to repeat it, if he does so in the same words, and at the same time gives his authority for the statement, because of the rebuttal of any presumption of malice in such cases. Waters v. Jones, 3 Port (Ala.) 442, 29 Am. Dec. 261; Johnson v. St. Louis D. Co., 65 Mo. 539, 27 Am. Rep. 293.

While at the present day the great weight of authority (which we approve) is to the effect that in ordinary cases of slander or libel, a person must be held liable for the publication of a libel or defamatory words in regard to another, even though he is but repeating what he has heard, and names his authority, and although the repetition is made without any design to extend circulation of the repeated libel or defamation, or to cause the person addressed to believe it is true (World Pub. Co. v. Mullen, 43 Neb. 126, 61 N. W. 108, 47 A. S. R. 737; Note 15 A. S. R. 342; 17 R. C. L. 319), yet the legal premise upon which the modern rule of actionable liability rests is, that a person who repeats a slander or libel is presumed by his reiteration of it, to indorse it and make it his own. Evans v. Smith, 5 T. B. Mon. (Ky.) 363, 17 Am. Rep. 74.

Unquestionably the general rule, independent of statute, is that a newspaper has no more right than a private individual to trifle with the reputation of any citizen, or by carelessness or recklessness in the publication of libels to injure his good name or business without answering therefor in damages. But the law of libel cannot be invoked to redress every casual misstatement of fact or every aggravating breach of good morals or manners in newspaper publications. Stewart v. Minnesota Tribune Co., 40 Minn. 101, 41 N. W. Rep. 457, 12 A. S. R. 696.

Publishers of newspapers while guaranteed the right to publish the truth, have no right to publish falsehoods to the injury of others. The greater the circulation of a libel, the greater the wrong which a newspaper can commit by publishing one. Therefore, there is ample reason why a high degree of care is required by law to be exercised by newspaper publishers to avoid the commission of wrongs in the publication of false articles or news of a personal nature, concerning which the publisher holds himself or his agents

out as the author and composer. But on the other hand, the mere reproduction in a newspaper of outside press dispatches, appearing in the newspaper's news columns as reported outside occurrences, and purporting on their face to have been solely derived from outside agencies, suggests the application of no such strict rule of liability.

Courts of justice are bound by the rule of *stare decisis* to follow the common law as it has been judicially declared in previously adjudicated case. And the Courts as such have no inherent right to revise or amend the setled rules of the common law to suit their own ideas of wherein the law should be modernized by amendments which would overturn long standing precedents. But it does not follow from what has been said in this regard, that the courts are wholly powerless to remold and reapply the ancient rules so as to fit them to modern conditions, where there has arisen and become involved, new factors of life and business arising from the complexities of a mechanized era of human progress. And indeed it is the duty of the courts to do so in cases appropriately calling for a modern application of ancient precepts to new facts of human experience in an advancing civilization.

Libels were actionable at common law, because the right of every individual to personal security, was deemed to embrace the right to be free from malicious publications, designed to give publicity to an imputation injuring one's good reputation. This theory caused libel to be denominated a tort. The tort consisted of the tort feasor's unjustified use of words or other visual representations which one, knowing the circumstances, would reasonably think defamatory of the person complaining of, and injured by them. Newell on Slander and Libel (4th Ed.), page 9.

*Malice,* either actual or imputed, becomes therefore the gist of every actionable libel. Without malice, either ex-

press or implied by law, no tort could result from the publication of a defamatory statement concerning another, however untrue it might be. But the law always conclusively implied malice and damage when false and defamatory statements were deliberately published without excuse.

If, therefore, malice be the determining factor by which actionable libel must be judged, a distinction must necessarily be drawn between those false and defamatory statements whose authorship lies with the publisher or his agents, and those statements which though false in whole or in part, and of defamatory tendency, nevertheless are but the incidental reproduction of some other person's publication already made through another's origination of what is subsequently reiterated. Within the purview of such distinction lies the difference between the nature of what is published as original news or editorial or other matter, and that which is merely reproduced as a republication of matter that has originated elsewhere in the form of news, been reported by news dispatches and thereafter given expression anew by means of local reproduction.

The mere reiteration in a daily newspaper, of an actually false, but apparently authentic news dispatch, received by a newspaper publisher from a generally recognized reliable source of daily news, such as some reputable news service agency engaged in collecting and reporting the news, cannot through publication alone be deemed *per se* to amount to an actionable libel by indorsement, in the absence of some showing from the nature of the article published, or otherwise, that the publisher must have acted in a negligent, reckless or careless manner in reproducing it to another's injury. This is in harmony with the theory that under the ancient rules of the common law, one who heard a slander, was not liable for repeating it, if he did so in the same words, and at the same gave in publishing it, his authority for the

statement made. That such was the ancient rule of the common law, was because of an implied rebuttal of a presumption of malice in such cases. And such implied rebuttal of a presumption of malice, on principle as well as authority, should extend to all matters· of ordinary news simply repeated or republished in a newspaper, where they are not plainly of such nature as to warrant a legal inference of malice through presumptive adoption of another false statement as the publisher's own. But this does not mean that words so published may not in many cases, be of such character, that on their face, a reiteration or republication of them would amount in law to such an indorsement of them, as to render their restatement or republication libelous *per se* where the published matter later proved to be false.

The modern daily newspaper is an institution of news dissemination that was unknown to the early common law. Hence the common law rules relating to ordinary newspaper publications of libelous words, had reference only to those matters of which the newspaper publisher purported to stand sponsor for the truth of. In ancient times, as now, the press was an effective agency commonly employed to push forward those whom it elected to favor, and to do harm to those whom it had disapproved. For this reason the power of newspapers when they came into being, was justly feared, and strict rules of law, were promptly announced by the courts to redress and punish wrongs deemed to have been maliciously committed by them, through the publication of false and defamatory statements affecting persons in their reputation, professions or businesses. None of these strict rules, however, was intended to take into account.or to have any bearing upon, present day phases of news dissemination, represented by the ordinary news columns of a modern newspaper.

Freedom of the press has long been a stated constitu-

tional guaranty, yet it has always been held from an early date, that the constitutional guaranty of "freedom of the press" did not secure to libelers immunity from evil or criminal prosecution, but was simply intended to secure to the conductors of the press the same rights and immunities, and such rights and immunities only, as were enjoyed by the public at large. Commonwealth v. Blanding, 3 Pick. (Mass.) 304, 15 Am. Dec. 214; Riley v. Lee, 88 Ky. 603, 11 S. W. 713, 21 A. S. R. 358; Note 15 A. S. R. 344. That such conception of the law of libel should still be applied to original compositions and published statements of which newspaper publishers made themselves the responsible originators or authors, is not to be denied.

But with purely news items, simply reproduced from apparently reliable sources of information, without carelessness or recklessness in their publication, and without any showing of malice or intent to do harm to the individual written about, where no special damage is alleged or shown, the legal situation is different. No newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies, and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all.

That malice is an essential ingredient of the plaintiff's case in actions of libel has been affirmed from earliest times. But to warrant a presumption of malice in law that will dispense with the proof of such malice in fact, the circumstances of the publication must be such that either from the plain purport of what is published, or from the circumstances of the publication itself, the presumption of malice and injury is raised. 17 R. C. L. 321-323.

No such presumption can be indulged with respect to simple reproductions of reported news items, apparently authentic on their face, and not suggestive of a duty to specially verify them in advance because of some intrinsic tendency for doing a wrongful injury, if they should prove untrue. This results from the very definition of an actionable libel which is the malicious publication by writing, printing, picture, effigy, sign or otherwise than mere speech, which exposes any living person to, or the memory of any deceased person to, hatred, contempt, ridicule or obloquy, or which causes or tends to cause any person to be shunned or avoided, or which has a tendency to injury any person, corporation or association in his or their business or occupation.

Turning now to the allegations of the amended declaration in the case before us, we find simply a situation wherein a newspaper is charged with having printed an ordinary news dispatch reciting that the plaintiff, John Layne, had been indicted with one Dennison, a "dry" congressman, for violation of the national liquor laws, which recital insofar as Layne is concerned, was untrue.

Conceding the proposition to be true that it is libel *per se* in ordinary cases to publish of and concerning another the false declaration that he has been indicted for a criminal offense, it does not necessarily follow that this rule holds true with respect to that class of publication which constitutes simply a reflection in a local newspaper's columns of what originated as a national news broadcast sent out by a reputable news service agency, and believed to be true when it was printed locally. To hold otherwise would mean that newspapers at their peril publish purported items of news, against the falsity of which, no ordinary human foresight could effectually guard and at the same time keep up the prompt daily service expected of present day newspapers. It

would also amount to an application of the doctrine of authorship by adoption of libel to situations which by no rule of reason can properly be brought within that rule, since the rule itself rests upon a legal presumption that one who knowingly publishes another's false defamatory statement, thereby makes the libel his own. Any such presumption is negatived when it is made to appear that the circumstance of the reiteration was casual and without anything appearing on the face of the matter published, to suggest preliminary verification in order to guard against obvious injury if the report is published and proves false.

In reprinting in its news columns matters of reported news items broadcast by such established news agencies as the Associated Press, Universal News Service, and the like, a newspaper is simply acting as a local "screen" from which is reflected, without any authorship of its own, dispatches composed and sent out by others. That such is the situation is so well known and generally acknowledged, that the courts, under the doctrine heretofore referred to in St. Lucie Bank & Trust Co. v. Aylin, *supra,* must take judicial notice of the practice. And taking judicial notice of the practice, the courts must apply to the new condition which the practice has brought about, a rule of reason with respect to legal presumptions that would otherwise flow from the publication of libelous matters such as occasionally creep into the best regulated agencies for collecting and disseminating the news.

We hold, therefore, that a declaration for libel predicated upon the alleged publication of a false news dispatch as to which neither the publisher, nor his agents, may be regarded as the author, must show either wantonness, recklessness or carelessness in its publication, or be counted upon as a libel *per quod,* in order to set up a good cause of action.

The plaintiff's amended declaration in the present case in

neither of the two counts thereof, complied with the requirements of this rule, therefore the demurrer thereto was properly sustained, and judgment properly entered for the defendant when the plaintiff refused to further plead.

Judgment affirmed.

WHITFIELD, TERRELL, and BUFORD, J. J., concur.

BROWN, J., concurs in the conclusion.