84 So.2d 549 (1955)
Isham W. ADAMS, Appellant,
v.
NEWS-JOURNAL CORPORATION, Julius Davidson, Herbert M. Davidson and Tippen Davidson, Appellees.
Supreme Court of Florida. En Banc.
November 2, 1955.
Rehearing Denied January 31, 1956.
Adams & Judge, Daytona Beach, for appellant.
Alfred A. Green, Daytona Beach, for appellees.
THOMAS, Justice.
A client of the appellant was about to face charges in the municipal court of Daytona Beach after an arrest which he had evidently resisted. The appellant, in his capacity as attorney, applied to the circuit court for a writ of prohibition to prevent the municipal judge from exercising jurisdiction of the case. To support the claim that the client was entitled to the writ, certain representations were made in the petition which was signed by appellant and verified by his client. Parenthetically, the circuit judge made the writ absolute and his action was affirmed by this court.
*550 The editors of News-Journal Corporation took umbrage at the conduct by appellant of the prohibition case and caused to appear in papers published and circulated by the corporation an editorial on the subject.
We quote the whole editorial which the appellant claims to have caused him suffering and injury, to have damaged his reputation "in his personal, social, business and professional life" and to have exposed him to hatred, distrust, contempt and ridicule:
"THERE IS A LIMIT
"DECENT CITIZENS believe there should be a limit to the accusations which a defense attorney should be allowed to make against law abiding persons, including law enforcement officers, in any move to protect his client.
"What is said here in this connection refers to one particular attorney, but it applies as well to many others.
"This week Isham Adams, attorney for Henry Hanna, filed a petition in Circuit Judge Revels' Court which challenges the attention of all citizens who believe in law enforcement. The petition sought a writ of prohibition preventing the Court from trying Hanna on charges dating back to Jan. 29, 1952. The writ was granted temporarily.
* * * * * *
"ATTORNEY ADAMS made grave accusations against some of our police officers in his zeal to save his client, Hanna, from going to trial on charges growing out of a fracas on that night more than two years ago.
"We read in the lawyer's petition that the police officers who arrested Hanna that night `did then and there commit an unlawful assault and battery' and did `beat, bruise, wound and physically overpower and subdue him.' The `him' refers to Hanna, who is a widely known character in the night life of Daytona Beach.
"Did Attorney Adams have any right to accuse these policemen of such dastardly behavior? Was the attorney a witness of what happened that night? Did he himself see his client suffer such beating, assault, bruising and wounding as he writes of in his petition?
"On the other hand did Attorney Adams see Police Officer Marvel King suffer such a terrific blow that night that he had to have an operation, and lie for weeks in a hospital?
"Did Attorney Adams question King and the other police officers as well as his client before making those accusations? If he did, then why did he choose to believe his client rather than the officers?
"We can see case hardened attorneys smile at these questions. We can hear some of them say Attorney Adams was only repeating in the petition what his client had told him. We can hear them say the attorney was not responsible for the allegations in the petition.
* * * * * *
"BUT WE DON'T ACCEPT that view. Having read the canon of professional ethics for practicing lawyers, we take the position that the attorney in this case, as in others like it, was responsible for trying honestly and diligently to get the facts in this case before accusing these police officers of committing crimes while on the job.
"We laymen in the law are held responsible for knowing the law and the facts in all matters having to do with law enforcement. Lawyers should be held at least as responsible as laymen.
"To accuse law enforcement officers of serious crimes, in a technical move to save a client from facing trial, is a mighty serious business.
"Henry Hanna's nocturnal doings are pretty common knowledge in Daytona *551 Beach. If our police did nothing to discipline him they would be subjected to merited censure. For them to be subjected to criminal accusations for acting in the line of duty is revolting to decent citizens.  F.B."
The lone question presented by the appellant and accepted by the appellee is whether or not the editorial was "defamatory of this plaintiff [appellant], a practicing attorney at law, and actionable per se * * *."
The circuit judge decided that it was not and dismissed the complaint at the cost of the plaintiff.
In a recent decision of this court certain rules were announced for our governance in determining whether or not publications are libelous per se. We held that they would be of this character when, "considered alone without innuendo," they contain (1) charges that a person has committed an infamous crime, or (2) has contracted an infectious disease, or (3) they carry statements tending to subject a person to hatred, distrust, ridicule, contempt or disgrace, or (4) to injure a person in his trade or profession. Richard v. Gray, Fla., 62 So.2d 597.
The first two of these categories may be eliminated from this discussion leaving as our main concern the effect the editorial might have had on appellant's professional standing, and the allied question whether or not he might have been held up to hatred, distrust, and so forth. The language used will be given neither a mild nor harsh construction but the words will be construed "in that sense in which they may be understood and in which they appear to have been used and according to the ideas which they were adopted to convey to those who hear them, or to whom they are addressed." Budd v. J.Y. Gooch Co., Inc., 157 Fla. 716, 27 So.2d 72, 74. The task of testing the effect of the language used is not an easy one because there is no fixed rule that would guide us to a conclusion. The judgment in each case must depend upon the facts peculiar to that case and a search for two identical instances would probably be unrewarded.
We will undertake to interpret the editor's phraseology "as the common mind would understand it." Loeb v. Geronemus, Fla., 66 So.2d 241, 245.
In the very beginning of the article there appears the declaration that decent citizens believe there should be a limit "to the accusations which a defense attorney should be allowed to make against law abiding persons" in his effort to protect his client. (Our italics.) It would tax the imagination to draw a conclusion that references to "decent citizens" and "law abiding persons" were slurs against the appellant. And the use of the word "allowed" seems to us to have implied that there was privilege or authority for what the attorney did in his client's behalf even though the editor, assuming to speak for the citizenry, disapproved the process.
This is followed by a statement that but one named attorney was in mind though the criticism could be applied to many others. Then the fact of the application for prohibition, a fact of which we take judicial notice inasmuch as the prohibition case was reviewed and affirmed here, is stated and the statement is amplified by the opinion that by the petition the attention of citizens believing in law enforcement is challenged. It would be illogical to read into this part of the editorial any defamation of the appellant. Almost any criminal case, or proceeding connected with it, might challenge "attention" but the suggestion would not reflect discredit on anyone concerned, except those directly charged with an offense.
Appellant is then said to have made grave accusations against police officers, but this is only an elaboration of the first paragraph where it was inferred that what he did was "allowed." The use of the word "zeal" was hardly libelous, for a lawyer is expected to show a keen interest in his client's welfare and it is only when he goes beyond the bounds of propriety that his actions may be condemned.
*552 Then follow rhetorical questions about appellant's own knowledge of the occurrence that accompanied the arrest of his client, and about his preference for the story given him by the client. How such questions are a reflection upon appellant's integrity or professional conduct we do not comprehend.
Next is an allusion to `case-hardened' attorneys and the smiles the rhetorical questions would evoke from them. As we understand the term a `case-hardened' attorney would be one who had become callous or unfeeling, however, there is no need to pursue the thought that the application of the term would be libelous because as it was used it would not to the "common mind" apply to the appellant but to those of that character who would be amused by the editorial itself.
Drawing to a conclusion, the writer took the position after relating that he had read the canon of ethics that the appellant in the case in question "as in others like it, was responsible for trying honestly and diligently to get the facts * * * before accusing * * * police officers of committing crimes while on the job." Such was the construction placed by the writer on the canon he had examined.
The editorial concluded with the general statement that lawyers should be as responsible as laymen "for knowing the law"; that accusing "law enforcement officers of serious crimes, in a technical move to save a client from facing trial, is a mighty serious business"; and that the goings on of the client were of such nature that the police would deserve censure if they did not curtail them.
Our study of the article brings us to the view that it constituted a criticism of a system by which the attorney acting within bounds, but within bounds the writer thought should be contracted, had succeeded in keeping a rascal from being tried. Although by the use of our "common mind" we can understand how irked the appellant may have become by the comment on the procedure that irked the editor, we do not find from the whole editorial, and such of the circumstances of its publication as are apparent in the record, the qualities which would stamp it as libelous per se. Cooper v. Miami Herald Publishing Co., 159 Fla. 296, 31 So.2d 382.
So the judgment is
Affirmed.
TERRELL and SEBRING, JJ., concur.
THORNAL, J., concurs specially.
DREW, C.J., and HOBSON and ROBERTS, JJ., dissent.
THORNAL, Justice (concurring specially).
I concur in the conclusions reached in the opinion by Mr. Justice THOMAS for the reasons therein announced. It appears that there was additional justification for the dismissal of the complaint in that the notice served on the appellees, purportedly in compliance with Chapter 770, Florida Statutes 1953, fails to meet the requirements of the act. F.S. § 770.01, F.S.A., reads as follows:
"Before any civil action is brought for publication, in a newspaper or periodical, of a libel, the plaintiff shall, at least five days before instituting such action, serve notice in writing on defendant, specifying the article, and the statements therein, which he alleges to be false and defamatory." (Emphasis ours.)
It should be noted that the act requires that the notice not only specify the article but also specify "the statements therein," which are alleged to be false and defamatory. A careful examination of the notice attached to the complaint reveals that it fails completely to meet this requirement. This was one of the grounds of the motion to dismiss.
While it is true that the notice reveals a broadside attack of falsity against the editorial involved, the fact remains that this *553 Court judicially knows that a substantial part of the factual statements contained in the editorial are true by virtue of the contents of the prohibition proceeding which was appealed to this Court and disposed of in Massfeller v. State ex rel. Hanna, Fla. 1954, 76 So.2d 304. When stripped of these statements judicially known to be true, the editorial under attack consists of little more than a series of questions and expressions of the editorial attitude of the publisher on a matter of public interest pending in the courts. Certainly the notice did not purport to separate the facts from the allegedly false statements. We cannot possibly determine from this record the statements which appellant actually contends were false.
The recognized purpose of the requirement of statutory notice to the publisher is to enable him to retract any false statements, or statements contended by the offended party to be false. It would appear that in order to meet the requirements of this statute, the notice should specify with particularity the statements in the offensive article which are alleged to be false and defamatory. See Walsh v. Miami Herald Publishing Co., Fla. 1955, 80 So.2d 669.
We find nothing in this record showing such compliance with the statute, and it is my judgment, therefore, that the notice was inadequate to sustain the complaint or to meet an essential condition precedent to the institution of the action.
TERRELL and SEBRING, JJ., concur.
HOBSON, Justice (dissenting).
The newspaper item upon which this libel suit is brought is reproduced in the opinion of Mr. Justice THOMAS. I am in complete agreement with all of the principles of law stated in that opinion. I cannot, however, agree with the result achieved by the application of these fundamental rules to the facts of this case.
Considering the statements in this newspaper article as the "common mind" would understand them, I cannot escape the conclusion that unethical conduct, consisting principally of making serious charges without as thorough an investigation as the ethics of the profession would demand, is clearly imputed to the plaintiff in his professional capacity. I do not believe that the "common mind" could be expected to make a shrewd and penetrating analysis of the article with a view to absolving the plaintiff from the guilt and unfitness imputed to him.
The practice of law is not a business, but a personal right conferred by the State upon a few persons of good moral character, who are certified after long study and thorough examination by a duly appointed examining body. The obligation of an attorney to the public is as significant as his obligation to his clients. In re Clifton, 115 Fla. 168, 155 So. 324. With the emphasis upon moral fitness and public obligation which the profession demands, it follows that to ascribe unethical conduct to a lawyer is to impugn his fitness to practice his profession.
"It is ordinarily actionable to charge a lawyer with cheating or swindling, sharp practice, or with being `unethical,' or engaging in unprofessional conduct, or with ignorance of the law and professional inefficiency." 53 C.J.S., Libel and Slander, § 38 (Footnotes omitted.)
In Annotation, Libel and Slander: Defamatory Charge Relating to Conduct of Attorney in Particular Case, 144 A.L.R. 814, 817-818, numerous cases from many jurisdictions are cited holding that language employed in describing the conduct of an attorney in a particular case, as here, was actionable per se. It is stated in page 817 "in all of these cases the charge made against the attorney contained an attack against his personal integrity by alleging conduct on his part amounting to a violation of the moral laws or of his professional code of honor."
Nothing appears in the instant case to take it out of the rules above quoted.
*554 I believe also that the notice which was sent to the appellee herein was sufficiently specific to comply with F.S. § 770.01, F.S.A. The statute requires that the notice specify "the article, and the statements therein" alleged to be false and defamatory. The degree of particularity required by the statute, in my opinion, depends upon the character of the libel upon which suit is brought. In Walsh v. Miami Herald Publishing Co., Fla., 80 So.2d 669, we held that a notice which specified less than all of the paragraphs in a particular article was sufficient, since the matter contained in those paragraphs was actionable per se. In the present case the entire article is alleged to be defamatory, but it is from the entire article that the imputation of unethical conduct comes. The notice filed herein is therefore, to my mind, sufficient to meet the requirement of the statute. Moreover, I do not believe that we can take judicial notice of any facts not before the court in this particular case, in considering the matter now before us. To do so might be appropriate if an affirmative defense were at issue, but not where, as here, we are confronted only with the question of the sufficiency of the complaint.
For the above reasons I would hold that the complaint states an actionable claim for libel per se. Accordingly I would reverse the judgment below for further proceedings not inconsistent herewith.
DREW, C.J., and ROBERTS, J., concur.
ROBERTS, Justice (dissenting).
This case should be reversed under the authority of Walsh v. Miami Herald Pub. Co., Fla., 80 So.2d 669, the petition for rehearing now having been denied; and further supporting a reversal is the case of Richard v. Gray, Fla., 62 So.2d 597. It is noteworthy that Mr. Justice Thomas and myself dissented in the Walsh case, and if the within opinion by Mr. Justice Thomas had been adapted to and filed as a dissenting opinion in the Walsh case I think I would have agreed to it as a dissenting opinion. However, I can not agree with it now as, in my opinion, both Mr. Justice Thomas and myself, although dissenters in the Walsh case, are bound by it; and being bound by it, I feel compelled to dissent in this case.