Melvin M. BELLI, Appellant,

v.

**ORLANDO DAILY NEWSPAPERS, INC.,**
et al., Appellees.

No. 23623.

United States Court of Appeals
Fifth Circuit.

Dec. 28, 1967.

Rehearing Denied Feb. 16, 1968.

Paul A. Louis, Bertha Claire Lee, Murray Sams, Jr., Miami, Fla., J. P. Tonkoff, Yakima, Wash., for appellant.

Richard W. Bates, Joseph P. Baker, George T. Eidson, Jr., Robert Dyer, Orlando, Fla., for appellees.

Before WISDOM and GODBOLD, Circuit Judges, and McRAE, District Judge.

WISDOM, Circuit Judge.

This action for damages for libel and slander is based on a false statement relating to Mr. Melvin Belli. Belli, an attorney of national prominence, is well known in the legal profession for his pioneering in the development of demonstrative evidence as a trial tactic and his success in obtaining large judgments for plaintiffs in personal injury suits. He is well known to the general public because of his representation of Jack Ruby and others in the public eye.

In March 1964 Mr. Leon Handley, an attorney in Orlando, Florida, in a conversation with Miss Jean Yothers, a columnist for the Orlando Evening Star, repeated a story he had heard concerning Belli. Handley told Yothers that the Florida Bar Association had invited Belli to serve as a member of one of the panels on the program of the Association at its 1955 Convention in Miami Beach. Belli agreed, with the understanding that "since there were no funds provided in the budget for payment per se for his contribution as a lawyer to the program the Florida Bar instead would pick up the hotel tab for himself and his wife during their stay." According to Handley, after Mr. and Mrs. Belli left Florida, the Association discovered that the Bellis "ran up a bunch of [clothing] bills" which they charged to their hotel room.[1]

---

1. Handley's story, as recited in the complaint is as follows:

[T]he Florida Bar wanted Belli to appear on a program and they informed him that they had—that they didn't have the money in the budget to pay him, but as a lawyer maybe he would agree to the plan of attending and participating and having his hotel bill paid for, and he agreed and came down here and was on the program, and after he and his wife had gone they discovered the hotel bill, that they had charged some clothing to their hotel bill * * * about $300.00. * * *

* * * that the Florida Bar was embarrassed over it. * * * the whole thing was an embarrassment to every member that knew about it. * * *

* * * that although Belli had been informed of the scarcity of funds and

The derogatory portion of the story was admittedly false: the Bellis had not charged any purchases to their hotel account. Unfortunately for all, Jean Yothers reported, with embellishments, this nine-year old story in her gossip column in the Orlando Evening Star for March 19, 1964. She commented, in part: " * * * Oops! * * * the plan backfired on the Florida Bar * * [Mr. Belli and 'his well-dressed wife' had charged] clothing bills amounting to hundreds of $s * * * to their hotel rooms. * * * The Florida Bar had been taken. * * * After all, that was the plan!" [2]

On these facts, Belli brought this diversity action. The complaint alleges that (1) Yothers, the Orlando Evening Star, and its editor libeled Belli through publication of the article, (2) that Handley slandered Belli in making the false statement to Yothers, and (3) that all of these parties, with others, participated in a conspiracy to defame Belli.

The district court dismissed Belli's complaint for failure to state a claim upon which relief could be granted. The court relied on the erroneous assumption that the determination whether a statement is a libel (or slander) per se is solely for the court. We consider it a close question whether the publication is so clearly defamatory that as a matter of law the case should not be submitted to the jury. We hold, however, that the publication itself, without reference to extrinsic facts, is capable of carrying a defamatory meaning. It is for a jury to determine whether it was so understood by the "common mind". We reverse and remand.

## I.

Historically, libel, as generally distinguishable from slander, was actionable without the necessity of pleading or proving that the plaintiff had suffered any damages as a result of it.[3] That is the accepted rule today in England [4] and in many jurisdictions in the United States [5] both as to libel per se and libel per quod.[6] A libel per se is one that is

had agreed to come down just for his transportation and hotel bill, he still ran up a bunch of bills. * * *

2. The article appeared in the Orlando Evening Star under the title "On the Town" by Jean Yothers and headed "Florida Bar Got the Bill". The full text is as follows:

Jack Ruby's flamboyant attorney Melvin Belli of San Francisco makes an indelible impression whither he goeth.

Consider the time he and Mrs. Belli were in Miami six or so years ago and Belli was a member of a panel at a program-meeting of the Florida Bar.

Here's what happened:

In making arrangements for Belli's participation it had been pointed out to him that since there were no funds provided in the budget for payment per se for his contribution as a lawyer to the program, the Florida Bar instead would pick up the hotel tab for himself and his wife during their stay. Belli agreed.

Oops!

A local attorney remembers, with embarrassed chagrin, how the plan backfired on the Florida Bar.

After the well-dressed Mr. Belli and his well-dressed wife left town, the ho-tel where they had been staying received clothing bills amounting to hundreds of $s. The Bellis had shopped in Miami stores and charged clothing bills to their hotel rooms.

The Florida Bar had been taken.

It was hard to stomach but the Board of Governors of the Florida Bar picked up the Bellis' bill.

After all, that was the plan!

3. For a general discussion of the history of the law of defamation, see Veeder, The History and Theory of the Law of Defamation, 3 Colum.L.Rev. 546 (1903), 4 Colum.L.Rev. 33 (1904). See also Plucknett, A Concise History of the Common Law, 454 (4th ed. 1948); 2 Pollock & Maitland, The History of English Law 536–38 (2d ed. 1898).

4. Youssoupoff v. Metro-Goldwyn-Mayer Pictures, 1934, 50 T.L.R. 581.

5. See Prosser, The Law of Torts 781 (1964).

6. Dean Prosser asserts that this is now the rule only in a "small minority of the American Jurisdictions". Prosser, The Law of Torts 781 (1964); Prosser, Libel Per Quod, 46 Va.L.Rev. 839, 644–47 (1960); Prosser, More Libel Per Quod,

defamatory on its face, including a publication that is susceptible of several meanings, one of which is defamatory; it is actionable without proof of special harm. A libel per quod is one in which the defamatory meaning, or innuendo, is not apparent on the face of the publication, but must be established by proof of extrinsic facts. Here the district court held, correctly, that the Belli claim "must be determined solely on the basis of whether it sufficiently alleges a publication which is libelous per se"—since, as is evident from the complaint, the plaintiff did not allege defamation by extrinsic facts or plead special damages.[7]

A. In its opinion below the court recognized that there are four categories of defamatory imputations which traditionally have been considered actionable without proof of harm. As set out in the Restatement of Torts, Second, Tentative Draft 12, Section 569, these are statements which impute to another "(1) a criminal offense, (2) a loathsome disease, (3) matter incompatible with his business, trade, profession or office, and (4) unchastity on the part of a woman plaintiff". Such defamatory statements, whether the publication is in the form of libel or in the form of slander, are regarded as especially likely to cause harm to the reputation of the person defamed, although such harm is not and perhaps cannot be proved. See Restatement, Second, Tentative Draft 12, Sections 569–574; Prosser, Law of Torts § 107 (1963); I Harper and James, Law of Torts § 5.9 (1956). Florida law recognizes these four traditional categories of per se libel and slander. Richard v. Gray, Fla.S.Ct.1953, 62 So.2d 597, 598; Layne v. Tribune, 1933, 108 Fla. 177, 146 So. 234, 236, 86 A.L.R. 466; Adams v. News-Journal Corp., Fla.S.Ct.1955, 84

So.2d 549, 551; Miami Herald Pub. Co. v. Brautigan, Fla.App.1961, 127 So.2d 718, 722.

■ Libel per se is not limited to these four categories: Courts use a stock formula to describe a general class of per se libel (but not per se slander). The Restatement's formula is:

One who publishes defamatory matter is subject to liability without proof of special harm or loss of reputation if the defamation is

(a) Libel whose defamatory innuendo is apparent from the publication itself without reference to extrinsic facts by way of inducement. Restatement, Second, Tentative Draft 12, Section 569.

In Florida and in many states the rubric runs: a libel per se is "any publication which exposes a person to distrust, hatred, contempt, ridicule, obloquy". For example, in Briggs v. Brown, 55 Fla. 417, 46 So. 325, 330 (1908) the court states the formula for libels per se as follows:

A civil action for libel will lie when there has been a false and unprivileged publication by letter or otherwise which exposes a person to distrust, hatred, contempt, ridicule, or obloquy * * * or which has a tendency to injure such person in his office, occupation, business, or employment. If the publication is false and not privileged, and is such that its natural and proximate consequence necessarily causes injury to a person in his personal, social, official, or business relations or life, wrong and injury are presumed and implied, and such publication is actionable per se.

This definition is in accord with earlier Florida cases and has been repeated with approval in many later decisions.[8]

79 Harv.L.Rev. 1629 (1966). But see Eldredge, The Spurious Rule of Libel Per Quod, 79 Harv.L.Rev. 733 (1966). See various tentative drafts of the A.L.I. Restatement of Torts, Second.

7. The district court granted the plaintiff leave to amend. The plaintiff stood by his contention that the publication was libelous per se.

8. E.g., Metropolis Co. v. Croasdell, 145 Fla. 455, 199 So. 568, 569 (1941); Layne v. Tribune Co., 108 Fla. 177, 146 So.2d 234, 236, 86 A.L.R. 466 (1933); McClellan v. L'Engle, 74 Fla. 581, 77 So. 270, 272 (1917); McCormick v. Miami Herald Publ. Co., 139 So.2d 197, 200 (Fla.Dist. Ct.App.1962).

B. There is no dispute between the parties as to these fundamental principles. The dispute centers about the district court's conclusion that "whether a given writing is or is not libelous per se is a question of law for the Court to determine". The court below found that Florida "appellate decisions do not disclose any clear statement that the existence of libel per se is a question for the Court and not for the jury, [but] the Court interprets cases [throughout the United States] as establishing this as a sub silentio proposition of Florida law".

■ We find that the general law and Florida law are in agreement with Dean Prosser's conclusion: "It is for the court *in the first instance* to determine whether the words are reasonably capable of a particular interpretation, or whether they are necessarily so; it is then for the jury to say whether they were in fact understood as defamatory. If the language used is open to two meanings * * * it is for the jury to determine whether the defamatory sense was the one conveyed." (Emphasis added.) Prosser, Law of Torts § 106, at 765 (1963). Similarly the Restatement, Second, Tentative Draft 12, Section 614, expresses the rule as follows:

(1) The Court determines

(a) Whether a communication is capable of bearing a particular meaning, and

(b) Whether that meaning is defamatory.

(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.

Section 615 states:

(1) The Court determines

(a) Whether the defamatory meaning of libel is apparent from the publication itself without reference to extrinsic facts, and

(b) Whether an imputation of crime or disease or of unchastity to a woman, is of such a character as to make libel or slander actionable without proof of special harm.

(2) Subject to the control of the court whenever the issue arises, the jury determines whether language imputes to another conduct, characteristics or a condition incompatible with the proper conduct of his business, trade, profession or office.

■ Both judge and jury play a part in determining whether language constitutes libel. The Supreme Court has delineated these roles in Washington Post Co. v. Chaloner, 1919, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987:

A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. * * * When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.

In most of the Florida cases relied upon by all of the parties to this suit the trial court disposed of the libel issue summarily, so that in those cases the role of the jury was not discussed on appeal.[9]

---

9. E. g., Budd v. J. Y. Gooch Co., 157 Fla. 716, 27 So.2d 72 (Fla.1964); Adams v. News-Journal Corp., 84 So.2d 549 (Fla. 1956); Walsh v. Miami Herald Publ. Co., 80 So.2d 669 (Fla.1955); Richard v. Gray, 62 So.2d 597 (Fla.1953); Commander v. Pedersen, 116 Fla. 148, 156 So. 337

(1934); O'Neal v. Tribune Co., 176 So.2d 535 (Fla.Dist.Ct.App.1965); Hevey v. News-Journal Corp., 148 So.2d 543 (Fla. Dist.Ct.App.1963). See also Summit v. Zetterlund, 287 F. 759 (S.D.Fla.1923); Grayson v. Savannah News-Press Inc., 110 Ga.App. 561, 139 S.E.2d 347, 351

In cases in which jury trials were had the appellate decisions do not reflect whether the issue of libel per se was submitted to the jury. However, in Miami Herald Pub. Co. v. Brautigan, Fla.App.1961, 127 So.2d 718, cert. denied, 135 So.2d 741, cert. denied 369 U.S. 821, 82 S.Ct. 828, 7 L.Ed.2d 786 (1962) the trial court submitted to the jury the question whether a news story criticizing a state attorney for "muzzling" the grand jury was libelous per se; the District Court of Appeal affirmed. Some Florida decisions have specifically referred to the jury's role in determining libel per se. See Caldwell v. Cromwell-Collier Publ. Co., 5 Cir. 1947, 161 F.2d 333, 336 ("a jury might well conclude * * * ") ; Metropolis Co. v. Croasdell, 145 Fla. 455, 199 So. 568, 570 (1941) ("the evidence adduced by the plaintiff, if believed by the jury * * * ") ; McClellan v. L'Engle, 74 Fla. 581, 77 So. 270, 273 (1917) ("the language used may or may not be, by a jury, considered * * *."), but none of these cases involved the precise issue confronting this Court. In Jones v. Greeley, 25 Fla. 629, 6 So. 448, 450 (1885), the Florida Supreme Court approved the instruction, "It is a question for the jury to determine whether or not the alleged libel bears the construction which the plaintiff in his declaration seeks to put upon it * * *."

C. The district court in this case completely excised the jury's role, a position it could take only on the assumption that the publication unambiguously carried no defamatory meaning. Since the court did not spell out its reasons, the defendants in their briefs have attempted to articulate the rationale for the holding below.

The defendants argue that the article did not "hurt" Belli as an attorney, did not imply that he was "losing his touch with demonstrative evidence", did not af-

fect his ability to "obtain those 'more adequate awards' for seamen and railroad workers for which he is so justly famous". In effect, so the argument runs, the article was nothing more than caustic comment on the acuteness of the Florida Bar Association. Belli simply "showed the Florida lawyers that their agreement was somewhat more favorable to him that they—in their naiveté—contemplated". In its harshest sense, they say, "the article implies no more than that Mr. Belli 'put one over' on the Florida Bar", which is "not quite the same as conning a destitute widow out of her homestead". In short, Mr. Belli just got "a little more out of the agreement than the Bar Association contemplated".

The defendants make a case—just barely—for the view that the article is capable of being reasonably interpreted as non-defamatory. But since the article on its face is also capable of carrying a defamatory meaning, it is for the jury to decide whether the words were in fact so understood.

The plaintiff contends, in his brief, "No person reading the headline and the article *sub judice* * * * could conclude other than that Melvin Belli, both as a lawyer and as a private citizen is grasping, conniving, contemptible, dishonest; a cheat, swindler, trickster, deceiver, defrauder; a person to be avoided, shunned and distrusted." Without benefit of the defendants' cavalier reading of the article or the plaintiff's retort hyperbolic, we consider that the bare bones of the article are capable of carrying the meaning that Belli tricked and deceived the Florida Bar Association out of hundreds of dollars worth of clothes.

The story alleges: (1) Belli knew that the Florida Bar Association's budget would enable him to be reimbursed only for his hotel bill; (2) subject to this limitation he agreed to participate in a

(1964) ; Walker v. Sheehan, 80 Ga.App. 606, 56 S.E.2d 628, 632 (1949) ; Hermann v. Newark Morning Ledger Co., 49 N.J. Super. 551, 140 A.2d 529, 530 (1958) ; Katapodis v. Brooklyn Spectator, 287 N. Y. 17, 38 N.E.2d 112, 137 A.L.R. 910

(1941) ; Appliance Buyers Credit Corp. v. Baxley, 241 S.C. 64, 127 S.E.2d 8, 10 (1962) ; Southern Publ. Co. v. Foster, 53 S.W.2d 1014, 1016 (Tex.Comm'n App. 1932) ; Frinzi v. Hanson, 30 Wis.2d 271, 140 N.W.2d 259 (1966).

panel discussion; (3) he deliberately planned to "take" the Association for hundreds of dollars by charging clothing purchases to his hotel bill; (4) he and his well-dressed wife left Miami before the Association found out about their purchases; (5) the Association, to its embarrassment, had to pick up the tab. "The Florida Bar had been taken. * * After all that was the plan."

■ The author's comment seems intended to insure the common reader's understanding of what purportedly happened. The common reader is likely to understand "take", just as Miss Yothers must have understood it. A recent dictionary defines it: "To cheat, deceive"; [10] other dictionaries agree with this definition.[11] The man in the street is likely to understand that hotel expenses do not include "hundreds of dollars worth of clothing". But any doubts the reader might have as to what purportedly happened are likely to be resolved by the reference to Belli's "plan" to "take" the Florida Bar. We hold that a jury might reasonably conclude that the conduct imputed to Belli was incompatible with the standards of an ethical lawyer and as such violated one of the four traditional categories of libel per se. A jury might also conclude that such conduct subjected Belli to contempt and ridicule humiliating him socially and injuring him professionally.

The Court has some doubt whether the publication in question carries a non-defamatory meaning. The Court has very little doubt that it carries a defama-tory meaning. The Court has concluded however that the final determination of the issue of defamation should be made by a jury.

■ The story is nine years old. It was not made within the context of a discussion of an important public issue. Nevertheless, the delimiting effect of the law of libel on First Amendment rights and a free press impels the Court not to excise the role of the jury. "Since one's reputation is the view which others take of him * * * [w]hether an idea injures a person's reputation depends upon the opinions of those to whom it is published." Developments in the Law: Defamation, 69 Harv.L.Rev. 875, 881–82 (1956). Thus, because it is impractical, even unreliable, to depend upon in-court testimony of recipients of the particular publication for determining whether that publication is defamatory, a logical function of the jury is to decide whether the plaintiff has been lowered in the esteem of those to whom the idea was published. As early as the seventeenth century, the court in Lord Townshend v. Dr. Hughes, 1693, 2 Mod. 150, 195, held that "words should not be construed in a rigid or in a mild sense, but according to the general and natural meaning, and agreeable to the common understanding of all men." Florida has adopted the common-mind test. Loeb v. Geronemus, Fla.1953, 66 So.2d 241. Any doubt as to the defamatory effect of a publication should be resolved by the common mind of the jury, and not by even the most carefully considered judicial pronouncement.

10. The Reader's Digest Great Encyclopedia Dictionary 1365 (1967).

11. See, for example, the Dictionary of American Slang 28 (1960) which defines "been taken" as "To have been taken advantage of, deceived, cheated or tricked, overcharged, sold misrepresented merchandise; swindled", or Webster's Third New International Dictionary 2330 (1966), which defines one of the meanings of the word "take" as "to impose upon, CHEAT, SWINDLE".

The seriousness of the charge of the newspaper article in this case, if inter-preted by a jury as suggested by the above-cited possible dictionary definitions of one of the terms used therein, can be measured in part by reference to Rule 11.02 of the Integration Rules of the Florida Bar 3(a): "The commission by a lawyer of any act contrary to honesty, justice or good morals, whether the act is committed in the course of his relations as an attorney or otherwise * * * and whether or not the act is a felony or misdemeanor, constitutes a cause for discipline."

## II.

Historically, the action for written defamation (libel) developed as a criminal action in the Star Chamber; the separate action for spoken defamation (slander) developed in the ecclesiastical courts. For the crime of libel, it was necessary to show harm only to the reputation; to recover on slander it was necessary to show pecuniary loss. The strict requirements for a slander action were rationalized on the ground that since libel is in a relatively permanent form and has a wider potential audience, pecuniary harm is so probable as to be presumed. See generally Veeder, The History and Theory of the Law of Defamation, 3 Colum.L.Rev. 546 (1903), 4 Colum.L.Rev. (1904). The difference between the law applicable to libel and that applicable to slander has been generally continued in the modern law of defamation. See Prosser, Law of Torts § 107 (1963); Developments in the Law: Defamation, 69 Harv.L.Rev. 876, 887 (1956); Harper and James, §§ 5.9, 5.10.

■ With slander, as with libel, certain defamatory words are actionable without proof of any actual damage to the plaintiff. These fall into the same categories of libel per se. Pollard v. Lyon, 91 U.S. 225, 226, 23 L.Ed. 308 (1875). This classification was accepted by the Florida Supreme Court in Loeb v. Geronemus, 66 So.2d 241, 244 (1953): "Only certain well-defined classes of imputation as to crime, disease, particular unfitness for office, etc., or unchastity, have been deemed slanderous per se." Accord, e. g., Campbell v. Jacksonville Kennel Club, 66 So.2d 495 (Fla.1953); Carter v. Sterling, 132 So.2d 430 (Fla. Dist.Ct.App.1961). Any allegedly slanderous statements not falling within any of these categories may constitute slander per quod but are actionable only upon a showing of special damages. Loeb v. Geronemus, supra; Carter v. Sterling,

supra. Belli has not complained of special damage by reason of Handley's statement.

■ In spite of language apparently limiting slander per se to four well-defined categories, Florida courts have adopted a broad view of what constitutes slander per se. In Sharpe v. Bussey, 1939, 137 Fla. 96, 187 So. 779, 780, 121 A.L.R. 1148, the court although emphasizing that "This action is for slander, not libel" quoted with approval the following language from Briggs v. Brown, 1908, 55 Fla. 417, 46 So. 325, 330, an action for libel and slander:

> If the publication is false and not privileged, and is such that its natural and proximate consequence necessarily causes injury to a person in his personal, social, official or business relations of life, wrong and injury are presumed or implied and such publication is actionable per se.

Later cases approve this language. Joopanenko v. Gavagan, 67 So.2d 434 (Fla.1953); Carter v. Sterling, 132 So.2d 430 (Fla.Dist.Ct.App.1961). In *Sharp* the defendant was alleged to have said that the plaintiff was at a Negro dance hall, dancing with Negro "wenches". The Court found that the statement made by the defendant, if false, would cause injury to the plaintiff "in his social, official and business relations of life" because the plaintiff would have been viewed as having forfeited "respect and confidence" of the community (Jacksonville, Duval County) and would have been held "in contempt" and have been "despised by self-respecting" white and Negro citizens.[12] In *Joopanenko*, the plaintiff alleged that the defendant, addressing a crowd and speaking of the plaintiff, said "Don't let that man speak, I know him and he is a Communist". The Supreme Court of Florida refused to decide whether the statement accused the plaintiff of having committed a

---

12. The Court in *Sharp* relied extensively on the *libel* case of Briggs v. Brown, 55 Fla. 417, 46 So. 325 (1908). Furthermore, in *Sharp* a possible ground for the Court's holding, and one alluded to at least indirectly, was the injury to the plaintiff in his official capacity as mayor. This would place the case within one of the traditional categories of slander per se.

crime, 67 So.2d at 437, and did not mention any effect of the statement on the plaintiff's business or profession. Instead, the Court held that "Such words hold him up to scorn, contempt and ridicule, causing such person to be shunned by his neighbors. * * *" In Florida then, the scope of a general class of slander per se includes statements holding another up to "scorn, contempt, and ridicule".

Handley's oral statement to Yothers, as it is repeated in the record, does not contain all of the derogatory language of the printed column. There is no reference to a "plan" to "take" the Florida Bar Association. Handley referred to $300 of purchases, not to hundreds of dollars of clothing bills. The difference is in degree. We hold that it is for the jury to decide whether his account of the story was defamatory.

### III.

Belli charges a conspiracy among Orlando Daily Newspapers, Inc., the Evening Star editor Martin Anderson, Jean Anderson, and other unnamed persons and corporations (but not Handley) to abuse, discredit, and vilify Belli through publication of the libelous article. The district court dismissed the conspiracy count as being too vague and indefinite to state a claim upon which relief may be granted. This dismissal is in error in light of our holding on the alleged libel.

In Loeb v. Geronemus, 66 So.2d 241, 243 (Fla.1953), the court stated that "whether the complaint * * * alleges facts sufficient to state a cause of action [for conspiracy] must be determined from the standpoint of whether the complaint states a cause of action in either libel or slander." Additionally, the Florida Court of Appeals, referring to an earlier Supreme Court decision, observed that "A complaint alleging a conspiracy * * *, an overt act done in pursuance

with the conspiracy and damages resulting from such overt act was held to contain all the essential elements of a malicious conspiracy." Reagan v. Davis, 97 So.2d 324, 327 (Fla.Dist.Ct.App.1957). Since the alleged libel in the present case is actionable, the complaint alleging the conspiracy, the publication of the libelous article, and damages resulting therefrom is sufficient to state a cause of action.

### IV.

The defendants, relying on New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and the appellate decision in Curtis Publ. Co. v. Butts, 5 Cir. 1965, 351 F.2d 702, 705, aff'd 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, and other lower court and appellate decisions,[13] assert that even if false the article in the Evening Star was a privileged commentary concerning a public figure; thus, if published without malice, the article could not give rise to liability for libel.

The New York Times doctrine has been expanded by the Supreme Court to encompass reporting of the conduct of "public figures". Curtis Publ. Co. v. Butts, 1967, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094. Edwin A. Walker, commander of the federal troops during the school segregation confrontation at Little Rock in 1957 and an outspoken advocate against federal intervention in such matters, Coach Wallace Butts, onetime head football coach at the University of Georgia, and Linus Pauling,[14] scholar, scientist, and winner of two Nobel Prizes, have been classified as "public figures". Not only must Belli be considered a public figure before the defendants can avail themselves of the *New York Times* privilege; the matter covered by the publication must be of legitimate and substantial public interest. Thus a court confronted with a

13. Walker v. Courier-Journal & Louisville Times Co., 5 Cir., 1966, 368 F.2d 189, reversing 246 F.Supp. 231 (W.D.Ky.1965); Pauling v. Globe-Democrat Publ. Co., 8 Cir. 1966, 362 F.2d 188; Pauling v. National Review, Inc., 49 Misc.2d 975, 269 N.Y.S.2d 11 (Sup.Ct.1966).

14. See Pauling v. Globe-Democrat Publ. Co., 8 Cir. 1966, 362 F.2d 188.

defamation suit in which the defendant asserts the *New York Times* privilege is compelled to make the dual inquiry (1) whether the plaintiff is a public figure and (2) whether the alleged defamatory publication is directed towards his public conduct. In most cases it is a relatively simple matter to determine whether the plaintiff is a public *official* and whether the defamatory comment is directed toward his *official* capacity. But in the case of a public *figure* there is substantially more room for the interplay of facts concerning his entry into the public arena and the nature of the issue in which he has become embroiled. We conclude, therefore, that the trial court is the proper arena for development of the relevant facts and resolution of the crucial issues in the first instance.[15]

Although it may be conceded that the event purportedly covered by the Evening Star article was not a "public issue" or "public event", it may have been a matter of "public interest".[16] New York Times v. Sullivan, supra. Garrison v. Louisiana, 1964, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125. We recognize, however, that we are here confronted with a case where the event reported was some nine years old and was reported in a gossip column. As the majority in Rosenblatt v. Baer, supra, 383 U.S. at 87, 86 S.Ct. at 677, recognized, concerning libel of a public official, "To be sure, there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify the New York Times rule." Furthermore, in a number of cases, some involving invasions of privacy, the privilege established in *New York Times* was not extended to public figures in circumstances concerning conduct or speech, however current, on matters of little or no public import.[17] We must leave it to the trial court, therefore, to determine whether Belli "was a public man in whose public conduct society and the press had a legitimate and substantial interest." Curtis Publ. Co. v. Butts, 388 U.S. at 165, 87 S.Ct. at 1997, 18 L.Ed.2d at 1117 (Warren, C. J., concurring).

The opinion of Mr. Justice Harlan, joined by three other members of the Court, in the combined cases of *Walker* and *Butts* adopts a more narrow view of the privilege regarding defamation of public figures than that set out in *New York Times* regarding defamation of public officials.[18] A majority of

---

15. *Cf. Rosenblatt v. Baer*, 1966, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597: "[A]s is the case with questions of privilege generally it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.' "

16. See generally Comment, Defamation of the Public Official, 61 Nw.U.L.Rev. 614 (1966); Comment, The Scope of First Amendment Protection for Good-Faith Defamatory Error, 75 Yale L.J. 642 (1966); Note, Free Speech and Defamation of Public Persons: The Expanding Doctrine of New York Times Co. v. Sullivan, 52 Corn.L.Q. 419 (1967); Supreme Court, 1966 Term, 81 Harv.L.Rev. 69, 160 (1967). The danger of adopting a circular definition of the scope of the New York Times privilege is discussed in the Supreme Court, 1966 Term, supra at 163.

17. Lorillard v. Field Enterprises, Inc., 65 Ill.App.2d 65, 213 N.E.2d 1, 7 (1965) (socialite); Faulk v. Aware, Inc., 14 N.

Y.2d 954, 253 N.Y.S.2d 990, 202 N.E.2d 372 (1964), cert. denied, 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (radio and television performer); Dempsey v. Time, Inc., 43 Misc.2d 754, 252 N.Y.S.2d 186, 189 (Sup.Ct.1964), aff'd, 22 A.D.2d 854, 254 N.Y.S.2d 80 (1964) (prizefighter); Spahn v. Julian Messner, Inc., 43 Misc. 2d 219, 250 N.Y.S.2d 529, 535 (Sup.Ct. 1964), aff'd, 23 A.D.2d 216, 260 N.Y.S.2d 451 (1965) (baseball pitcher).

18. Compare the New York Times standard with the standard stated in Mr. Justice Harlan's opinion, 388 U.S. 130, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 104. We consider and would hold that a "public figure" who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily

the Court, however, extended the *New York Times* standards to encompass public figures. The Court in *New York Times* required "convincing clarity" of the proof presented to show actual malice, 376 U.S. at 285–286, 84 S.Ct. 710 (and found it lacking in that case); however, this requirement extends only to the proof required to meet the constitutional demands. As to the *complaint*, the Federal Rules of Civil Procedure require only that "Malice, intent, knowledge, and other condition of mind of a person * * * be averred generally." Rule 9(b). In his amended complaint Belli charged the defendants with actual malice in publication of the allegedly libelous article. This charge then, is sufficient on its face to establish a basis for a showing of actual malice by defendants in the perpetration of the alleged libel, as required by the *New York Times* decision.

We reverse the dismissal of the district court and remand the case for further proceedings consistent with this opinion.

GODBOLD, Circuit Judge (specially concurring):

I agree that the district court erred in dismissing the plaintiff's complaint for failure to state a claim upon which relief could be granted. But as to some of the principles that will guide the district court in further proceedings, my views differ from those stated in the careful and scholarly opinion of the majority.

There are two aspects to the complex problem of defining the provinces of judge and jury in a defamation case. The first involves a determination whether the publication complained of falls within one of the four categories which permit an action to be maintained without allegation or proof of special damages. Although the matter is not free from doubt, in Florida this question seems to be one for the court. McCormick v. Miami Herald Publishing Co.,

139 So.2d 197 (Fla.App.1962); see Adams v. News-Journal Corp., 84 So.2d 549 (Fla.1955). Compare Miami Herald Publishing Co. v. Brautigam, 127 So.2d 718 (Fla.App.1961). The second concerns whether the published statement is defamatory. On this point there is general agreement that it is for the judge in the first instance to determine whether the words are capable of defamatory meaning; if so it becomes the duty of the jury to decide whether they are defamatory in fact. 1 Harper & James, Torts § 5.29 (1956); Prosser, Torts § 106 (3d ed. 1964). This does not preclude the judge from ruling, in an appropriate case, that the meaning of the publication is so unambiguous when construed in the sense in which ordinary readers would understand it that it is defamatory as a matter of law. Washington Post Co. v. Chaloner, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987 (1919). "If the article standing alone is plainly libelous, or manifestly wanting in any defamatory meaning, it is the duty of the court to declare either way and instruct the jury accordingly." Newell, Slander & Libel 362 (3d ed. 1914). I fail to see any way in which reasonable men could construe the statements, oral and written, in this case in a nondefamatory sense, and would therefore hold them defamatory as a matter of law. The expressed doubt of the majority whether the newspaper statements could carry a nondefamatory meaning is but little less firm than my view. The role of the jury is not to be excised. Nor is that of judges. If the content of language is defamatory beyond cavil, freedom does not call for allowing the defamer to make a second attack on the victim's reputation, though done in a judicial atmosphere, on the theory of showing that to the common mind the victim has not suffered in esteem. Judges deal regularly with questions of what ordinary and reasonable people do and think, in the field of constitutional liberties as well as elsewhere, and the properly exercisable judicial role is not diminished on

---

adhered to by responsible publishers. But see Rose v. Koch, Minn.1967, 154 N.W.2d 409, which interprets *Butts* as

setting out separate standards for public officials and public figures.

the ground that reputation is what is injured.

## ON PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25(a), subpar. (b), the Petition for Rehearing En Banc is denied.