**Mary Alice FIRESTONE, Plaintiff-Appellee-Cross Appellant,**

v.

**TIME, INC., Defendant-Appellant-Cross Appellee.**

**No. 71-1887.**

United States Court of Appeals, Fifth Circuit.

April 20, 1972.

---

Larry S. Stewart, William S. Frates, Miami, Fla., Harold R. Medina, Jr., New York City, Frates, Floyd, Pearson & Stewart, Miami, Fla., for appellant; W. Dennis Cross, New York City, of counsel.

Joseph D. Farish, Jr., Farish & Farish, West Palm Beach, Fla., for appellee.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

In this libel action against a publisher of a national magazine, we are called upon again to apply the principles of New York Times Company v. Sullivan [1] and its progeny, to determine if the constitutional guarantees of the First and Fourteenth Amendments confer immunity from claims for damages, under the facts and circumstances of the case.

Mary Alice Firestone filed this Florida diversity suit for compensatory and punitive damages based on alleged libel and invasion of privacy against Time, Inc., growing out of the publication of an article in Life Magazine, owned by defendant. The matter is before us for the second time. (See Firestone v. Time, Inc., 5 Cir., 1969, 414 F.2d 790, for our prior opinion.) When this case was first appealed, Mrs. Firestone's complaint had been dismissed by the District Court on motion to dismiss. However, we reversed and remanded for further disposition, since it did not appear to a certainty that plaintiff would be entitled to no relief under any set of facts which could be proved in support of her claim. Id., 414 F.2d 790.[2] See also Arthur H.

---

[1] 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

[2] In our first opinion we concluded that "plaintiff's journey from *allegata to pro-*

Richland Company v. Harper, 5 Cir., 1962, 302 F.2d 324, 325; Shell v. Hensley, 5 Cir., 1970, 430 F.2d 819, 826; Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

The publication complained of appeared in Life Magazine on May 20, 1966, in a lengthy feature story about electronic eavesdropping. Highlighted on the cover of the magazine the article was entitled "THE BIG SNOOP," "Electronic Snooping Insidious Invasion of Privacy." The cover showed a young lady partially undraped with a tiny transmitter taped to her back where her dress in place would conceal it. On the first page of the article was a photograph of a "bugged martini" with a plastic olive containing a built-in sending device and toothpick antenna which it was said could transmit a cocktail party conversation 100 feet. The article referred to eavesdropping as a "multi-million dollar industry"; and said that bugging is "shockingly widespread" and "increasingly insidious." In ten full pages "LIFE reveals in detail this electronic assault on privacy . . . . " There are photographs and text pertaining to all types of electronic eavesdropping devices and "bugs." On one page of the story a photograph is captioned "Divorce Spy." Pictured is Jack Harwood of Palm Beach, Florida, apparently the "divorce spy". Immediately beneath his photograph is another of Russell Firestone and his estranged wife Mary Alice Firestone, plaintiff in this case. The magazine's text concerning the photographs of Harwood and Russell and Mary Alice Firestone is the specific subject matter of this suit and reads as follows:

"TWO-WAY SNOOP. In Florida, where electronic eavesdropping is fre-

quently employed in divorce suits, private eyes like Jack Harwood of Palm Beach, shown above with some of his gear, do a thriving business. Harwood, who boasts, 'I'm a fantastic wire man,' was hired by tire heir Russell Firestone to keep tabs on his estranged wife, Mary Alice. She in turn got one of Harwood's assistants to sell out and work for her and, says Harwood, 'He plays just as rough with the bugs as I do.' A court recently ordered Russell and Mary Alice to stop spying on each other."

The Firestones were then engaged in marital litigation in a Florida State Court. The record discloses that the Harwood assistant referred to and about which there is considerable testimony was one Carl Geisler.

The two-count amended complaint alleged that the Life Magazine article defamed plaintiff where it stated, "She in turn got one of Harwood's assistants to sell out and work for her . . . ."; that plaintiff has enjoyed an unblemished reputation but, as a result of the defamatory article, has been severely injured in her personal relations and has suffered severe damage to her reputation in the community; that defendant well knew that the employee [Geisler] said to have sold out to work for plaintiff was a private investigator who was to become a witness in the divorce action and whose credibility was severely damaged by the publication; that the defamatory words were intended to convey the meaning that plaintiff would incite Harwood's employee to commit perjury in violation of Florida Statutes, FSA § 837.04,[3] thus accusing plaintiff of committing a felony; that plaintiff's position in the court where the marital litigation is pending has been irreparably damaged by the article; that the publi-

bata may well be a hard one, but she is entitled to make the effort however illusory the destination may be in face of her contentions of innuendo." Id., 414 F.2d at 791.

3. Florida Statutes, FSA § 837.04 reads as follows:

"837.04 Inciting to commit perjury

"Whoever endeavors to incite or procure any other person to commit perjury, though no perjury is committed, shall be punished by imprisonment in the state prison not exceeding five years or in the county jail not exceeding one year."

cation has invaded the privacy of plaintiff's personal affairs causing her to become subject to disgrace and humiliation; that her private activities and her private divorce litigation were not matters of public concern or interest; that the defamatory language in the publication was false, to the knowledge of defendant, and was made with reckless and utter disregard for its truth or falsity, and with malice toward plaintiff. Defendant denied the allegations of the complaint and averred that the publication complained of was true, consisted of reports on matters of public interest, was made in good faith, pursuant to its duty to inform the public; that the publication was made without malice in a national news magazine of general circulation and is privileged and protected by the First and Fourteenth Amendments of the Constitution of the United States.

The case was tried before the District Judge, sitting without a jury, and resulted in judgment in favor of plaintiff for $15,000 compensatory damages and $15,000 additional punitive damages. Both parties have appealed, defendant contending that suit should have been dismissed in its entirety and plaintiff asserting that the award of punitive damages was inadequate.

The District Judge in written findings of fact and conclusions of law reviewed Florida jurisprudence relative to actions for libel under the law of that state.[4] He held that when Life's article stated that plaintiff caused one of Harwood's assistants [Geisler] to sell out to her, it necessarily charged that she paid him to betray her husband in a marital dispute between them, and that she had caused him to transfer his allegiance and confidentially obtained knowledge to her—in fact, that she "bribed" Harwood's assistant; that the article was actionable per se and libelous. He further held that the article was not constitutionally protected under the doctrine of New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), because plaintiff was not of the class of persons referred to in that decision nor a public character and "[h]er private affairs were not a matter of legitimate public concern."[5] However, the District Judge made alternative findings and conclusions to the effect that even if New York Times were applicable plaintiff had sustained the burden of proof and was entitled to recovery. He held that Life's editorial staff "necessarily had a high degree of awareness of the probable falsity of the statements" at-

4. The pertinent finding by the District Court reads as follows:

"4. Florida jurisprudence does maintain a general distinction between statements which are actionable per se and those which are actionable per quod. The only material difference, however, is that in the latter case special damages must be pleaded and proved while in the former, damages are conclusively presumed to result from the very nature of the defamatory statement.[2] Un-

2. See 20 Fla.Jur., Libel and Slander, § 6 (1968); Firestone v. Time, Inc., 414 F.2d 790, 791.

der Florida law, any written language published of a person which 'tends to degrade him, bring him into ill repute, to destroy the confidence of his neighbors in his integrity, or to cause other like injury to him is actionable per se.'[3]

3. 20 Fla.Jr., Libel and Slander, § 22; Belli v. Orlando Daily News-

papers, Inc., 389 F.2d 579, 582 (5 Cir. 1967)."

5. The Trial Judge's finding (No. 9) reads as follows:

"9. The court has previously ruled, on defendant's motion for summary judgment, that the article insofar as it related to plaintiff was not constitutionally protected under the New York Times doctrine. The court adheres to that ruling. The plaintiff was not of that class of persons who are 'intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.' Her private affairs were not a matter of legitimate public concern. The court reiterates that the mere fact that a publisher sees fit to refer to a particular individual in print does not establish the 'public' character of the person or reference."

tributed to Harwood relative to a "sell out," and that the conclusion was "inescapable" that the complained of words "sell out" were written "with reckless and wanton disregard for the truth and necessarily with serious doubts as to the truth" thereof. In his view, plaintiff suffered personal and public humiliation and her reputation was injured. In summary, the Court held that defendant had "falsely libeled" plaintiff, thus entitling her to compensatory and punitive damages.[6] However, the Trial Court held that plaintiff had no action for invasion of privacy because she had given "limited consent" to publication.[7]

Our review of this case is written with the principles of the recent decision of the Supreme Court in Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), squarely before us. In *Metromedia,* the Supreme Court reached a new dimension under the First Amendment constitutional protection for freedom of speech and of the press. No longer did the constitutional guarantee apply only to suits of public figures or public officials but in a sweeping decision the plurality opinion of the Court (by Justice Brennan) extended "constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." Id., 403 U.S. at 44, 91 S.Ct. at 1820.

The holding in *Metromedia* was anticipated by this Circuit in several prior decisions beginning with Time, Inc. v. McLaney, 5 Cir., 1969, 406 F.2d 565, cert. denied, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1962), where we held that "the constitutional privilege extends to discussions by specific individuals, not associated with any government, if those individuals are involved in matters of important public concern." 406 F.2d at 573. Next, in Bon Air Hotel, Inc. v. Time, Inc., 5 Cir., 1970, 426 F.2d 858, we said, "This Court in Time, Inc. v. McLaney . . . noted that the New York Times actual malice standard is applicable to publications involving matters of great public interest." 426 F.2d at 861. Then in Time, Inc. v. Ragano, 5 Cir., 1970, 427 F.2d 219, we reaffirmed the applicability of the New York Times standard requiring actual malice where the alleged defamatory article concerned a matter of great public interest, a statement being made with actual malice if made "with knowledge that it was false or with reckless disregard of whether it was false or not." 427 F.2d at 221; New York Times Company v. Sullivan, 376 U.S. at 280, 84 S.Ct. at 726. In Dacey v. Florida Bar, Inc., 5 Cir., 1970, 427 F.2d 1292, we said again,

---

6. The Trial Judge's finding (No. 21) held in pertinent part: "In summary, *the defendant has falsely libeled the plaintiff* for which she shall recover the sum of $15,000 as compensation for actual damages suffered." This is a finding that the Life article (insofar as it affected plaintiff) was false and untrue. Thus we differ with Time, Inc.'s Reply Brief which contends that the District Court did not even find the article to be false, though resolution of this issue is not critical to our decision herein, for reasons we have already explained.

7. When the Trial Judge denied defendant's motion for summary judgment, in an order containing written reasons, he held:
"Defendant first contends that the article was constitutionally protected under the doctrine of New York Times Co. v. Sullivan, 376 U.S. 254 [84 S.Ct. 710,

11 L.Ed.2d 686] (1964) and the subsequent cases that have expanded those concepts. The court is of the opinion that the plaintiff is not a 'public figure' under those authorities. And, while the general subject of eavesdropping may be considered a 'matter of great public concern,' certainly the plaintiff's private marital difficulties, as referred to in the article, are not of that character. Thus, while the general subject matter of an article might be protected, it *does not* follow that every particular reference therein is similarly immunized. It *should also be stated that the fact that a* publisher sees fit to refer to a particular individual in print does not establish the 'public' character of the person or reference. The law in this area has not stretched so far as to allow the publisher *to create its own defense to possible litigation."*

"that the First Amendment privilege extends to discussions of specific individuals, not associated with any government, if those individuals are involved in matters of important public concern." 427 F.2d at 1295.[8]

Thus, somewhat prior to *Metromedia*, the Fifth Circuit was already firmly on record, as the above decisions illustrate, as holding that the constitutional privilege in favor of a publisher extends to publications relating to specific individuals, whether public figures or not, if those individuals are involved in matters of "important public concern," or "of great public interest," or "of important public concern."

As now expressed by the Supreme Court in *Metromedia*, 403 U.S. at 44, 91 S.Ct. at 1820, "It is clear that there has emerged from our cases decided since *New York Times* the concept that the First Amendment's impact upon state libel laws derives not so much from whether the plaintiff is a 'public official,' 'public figure,' or 'private individual,' as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest."

■ It cannot be doubted that electronic eavesdropping is a matter of general public concern. Apparently the Trial Judge thought so in this case.[9] We construe the briefs and arguments of the parties to concede as much.

However, plaintiff contends that though the Life Magazine article on electronic eavesdropping may be an article on a subject of general public interest and concern, it does not confer an unlimited privilege on the magazine to discuss the private, personal and marital difficulties of plaintiff, and more particularly does not authorize the use of false and defamatory matter known to be false or with serious doubts as to its truthfulness.

■ In our view the complained of text of the Life Magazine article under the caption "TWO-WAY SNOOP" is directly related to the central theme of the story. It states that electronic eavesdropping is frequently employed in divorce suits. A photograph of Harwood, a person who apparently specializes in the use of such equipment, is likewise so related. Whether Life was justified in stating in the caption that plaintiff Mary Alice Firestone "got one of Harwood's assistants to sell out and work for her" must be measured against the New York Times standard of knowing or reckless falsehood. As a reviewing court, we "cannot avoid making an independent constitutional judgment" on the facts of the case. *Metromedia*, 403 U.S. at 54, 91 S.Ct. at 1825; Jacobellis v. Ohio, 378 U.S. 184, 190, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (1964).[10] "The simple fact is that First Amendment questions of 'constitutional fact' compel

---

8. See also United Medical Laboratories Inc. v. Columbia Broadcasting System, Inc., 9 Cir., 1968, 404 F.2d 706, cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

9. See n. 3, supra.
See pertinent part of the District Court's findings (Finding No. 10) as follows:
"Thus, while the general subject of electronic eavesdropping might properly be considered a matter of public concern, the plaintiff's private marital difficulties as referred to in the article were not."

10. In *Jacobellis*, a First Amendment case involving a conviction for possessing and

exhibiting an obscene film, the Supreme Court speaks of the necessity for recognition of the Court's duty to apply rules of law "upon the basis of an independent review of the facts of each case." Id., 378 U.S. at 189, 84 S.Ct. at 1678. See also Pennekamp v. Florida, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946); New York Times Company v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 728–729, 11 L.Ed.2d 686 (1964); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83, 88 S.Ct. 197, 199, 19 L.Ed. 2d 248 (1967); Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 11, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970).

this Court's *de novo* review."[11] *Metromedia*, 403 U.S. at 54, 91 S.Ct. at 1825.[12] Though civil litigation is ordinarily decided by the preponderance of the evidence, that standard along with the reasonable man standard of liability are rejected by the Supreme Court, as being inconsistent with the First Amendment. *Metromedia*, 403 U.S. at 50, 91 S.Ct. at 1823. A negligence standard "gives insufficient breathing space to First Amendment values," *Metromedia*, 403 U. S. at 52, 91 S.Ct. at 1824; "[a] negligence test would place on the press the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait." Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 .(1967). " . . . our 'cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' St. Amant v. Thompson, 390 U.S., [727] at 731, 88 S.Ct. [1323] at 1325 [20 L.Ed.2d 262]." *Metromedia*, 403 U.S. at 56, 91 S.Ct. at 1826. In this libel action the judgment in favor of plaintiff, a private individual, against the publisher of a national magazine "relating to [her] involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." *Metromedia*, 403 U.S. at 52, 91 S.Ct. at 1824.

◼ We have already determined that the Life Magazine article was on a matter of general public interest and that the part of the text relating to the Firestone marital difficulties and electronic eavesdropping employed in connection with the divorce action were germane to the article's principal theme and subject matter.

◼ In our own independent *de novo* review of the facts of this case and in our search for the clear and convincing proof in the record which is required to sustain a judgment for plaintiff, we have examined the evidence to determine whether the magazine article was published with knowledge that it was false or with reckless disregard of whether it was false or not. Having done so we reach an opposite conclusion from that of the District Court. Clear and convincing proof greater than a preponderance is simply not to be found in the record. We suspect, for reasons we shall point out, that the Trial Judge used a negligence standard (or failure to use reasonable care) in determining that defendant was liable. Employing such a standard is obvious error when we consider the Supreme Court's recent decisions involving freedom of the press as guaranteed by the First Amendment. Likewise, it should be remembered that since our review of the facts of the case is *de novo*, we are not bound by the findings of the District Court. Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 636–637, 28 L.Ed.2d 45 (1971).[13] It is at

11. *De novo* is defined as meaning "anew; afresh; again; from the beginning." Random House Dictionary of the English Language (1966 ed.). See also Black's Law Dictionary (4th ed. 1951).

12. See also Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed. 2d 697 (1963), in which the Court refers to its duty "to make an independent examination of the whole record," and Blackburn v. Alabama, 361 U.S. 199, 205 n. 5, 80 S.Ct. 274, 279, 4 L.Ed.2d 242

(1960), in which the Court said, "we cannot escape the responsibility of scrutinizing the record ourselves." Both cases were, of course, First Amendment cases.

13. In Time, Inc. v. Pape, supra, the Supreme Court said:
"The only question before us, therefore, is whether the Court of Appeals correctly applied this constitutional rule to the facts of this case in reversing the directed verdict for the defendant. Inquiries of this kind are familiar under

once apparent that the scope of review in First Amendment libel cases is the broadest possible under the law. The Supreme Court has fashioned such broad review because our early history and expressions by our founding fathers, such as Madison, indicate that liberty of the press is considered "sacred" in America, and that our free society is dependent for its survival upon a vigorous free press.[14] The immunity conferred by the First Amendment in favor of a publication is therefore designed more for the protection of the public generally than it is for the publisher himself.

The facts show that when Life began assembling the materials for this article it sent David Chandler to Florida to make an investigation as a reporter into the use of electronic eavesdropping devices in connection with sensational divorce actions in that area. Chandler had originally been employed by Life in 1964 and had been working for the magazine for nearly four years at the time. His immediate superior, Richard Billings, considered him a reliable reporter based on his past experience with him in work he had done for the magazine. It was Chandler who provided the facts for Billings and Life's editorial staff which formed the basis of the caption in the article pertaining to plaintiff getting one of Harwood's assistants to "sell out" and work for her. The assistant referred to was Carl Geisler. It is undisputed that Geisler worked for Harwood in his private detective business at a time when Harwood was employed by plaintiff's husband Russell Firestone in surveillance of Mrs. Firestone, plaintiff herein. The evidence is conclusive that later Geisler wound up on plaintiff's side of the divorce controversy and was seen several times in her company. Chandler secured his information about the controversial "sell out" from Harwood and at the trial of this case Harwood testified that he had indeed told Chandler that Geisler, a former private investigator employed by him, was then working on the other side but Harwood said that he had told Chandler the information had come to him from anonymous phone calls.[15] He testified that he

the settled principle that '[i]n cases in which there is a claim of denial of rights under the Federal Constitution, *this Court is not bound by the conclusions of lower courts, but will re-examine the evidentiary basis on which those conclusions are founded.*' Niemotko v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267. Cf. Napue v. Illinois, 360 U.S. 264, 271–272, 79 S.Ct. 1173, 1178–1179, 3 L.Ed.2d 1217. And in cases involving the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other, we have frequently had occasion to review 'the evidence in the . . . record to determine whether it could constitutionally support a judgment' for the plaintiff. *New York Times*, supra, 376 U.S., at 284–285, 84 S.Ct., at 728; Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83, 88 S.Ct. 197, 199, 19 L.Ed.2d 248; St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262; Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6."
(Emphasis by the Court.) Id., 401 U.S. at 284, 91 S.Ct. at 636, 637.

14. *Metromedia*, 403 U.S. at 51, 91 S.Ct. at 1823.

15. Pertinent portions of Harwood's testimony at the trial of this case read as follows:
"BY MR. FRATES:
"Q. Mr. Harwood, let me show you your deposition. Do you recall the deposition when Mr. Stewart and I came up and Mr. Lindsey, this gentleman here, took your deposition—
"A. Yes, sir.
"Q. —over in a court reporter's office—
"A. Yes, sir.
"Q. —and Mr. Stewart, this gentleman back here, interrogated you and had some conversations. Have you had an opportunity to read this deposition?
"A. I don't believe I have ever read it.
"Q. I ask you if this refreshes your recollection here, sir.
"Mr. FARISH: What page, Counsel, so I can check it?
"MR. FRATES: Page 7.
"BY MR. FRATES:
"Q. 'And when you discussed—' I am reading from Line 9—'*when you discuss-*

told Chandler that he had suspicions that while Geisler was still employed by him he was friendly with Mrs. Firestone's side in the divorce controversy. Harwood added that Geisler "had been acting very strange."

> ed the Firestone case with Mr. Chandler did you discuss with him and did you advise Mr. Chandler and tell him that Geisler, after having worked for you, went over and worked for Mrs. Firestone?"
>
> "And your answer was 'Yes.'.
>
> "Do you recall that?
>
> "MR. FARISH: Your Honor, I object to that. Your Honor, has already ruled that is improper. He is trying to impeach his own witness.
>
> "Mr. FRATES: Now, sir, your Honor said that I could ask this one.
>
> "MR. FARISH: He is trying to impeach his own witness, sir. He offered this man's testimony.
>
> "The COURT: I will sustain the objection. I let him read that so he could refresh his recollection—this man's memory what this man had said on a previous occasion.
>
> "BY MR. FRATES:
>
> > "Q. Let me read the whole thing.
> >
> > 'Yes.' then 'On the other side of the case?'
> >
> > And your answer 'Yes.'
> >
> > "Q. And did you also tell him that it was your opinion that Geisler had sold out in going over to the other side?
> >
> > "And your answer under oath was 'Yes.'
>
> "Do you recall making those statements, Mr. Harwood—
>
> "Mr. FARISH: Object.
>
> "Mr. FRATES: Excuse me.—to Mr. David Chandler:
>
> "Mr. FARISH: To which I object, your Honor. He is attempting to impeach his own witness.
>
> "THE COURT: I will overrule the objection for this particular moment, since it is—
>
> "The WITNESS: Yes, sir, I remember making that on the deposition.
>
> "BY MR. FRATES:
>
> > "Q. And are those correct statements that you made under oath?
> >
> > "A. Reasonably so, yes."
>
> (Emphasis is supplied by the Court.)

16. Pertinent extracts from Chandler's dispatch to Life follow:

> "Harwood has been shadowing Mary Alice since just before February, 1964. Since that time, he has developed a

The information concerning the "sell out" was telegraphed by Chandler to Life Magazine at New York, attention of Billings.[16]

The District Judge in analyzing the testimony found that Billings and others

> paranoiac hatred of her. He calls her a nymphomaniac pig. She hates him, too, but is less descriptive about it. She wooed one of Harwood's top investigators, Carl Geisler, to work in her interests. Geisler and Mary Alice's brother, Charles Turner, combined as her and her three-year-old child, Mark, bodyguard. (A. 73)
>
> \* \* \* \* \*
>
> "Mrs. Firestone continues: 'I made phone reservations for a plane to Freeport (Bermudas) and told no one else I was going. Harwood's detectives were on the plane. They took pictures of me when I got off in Freeport.
>
> "Another time, I had gone home one night and gone to sleep and all of a sudden heard this terrible noise, more than a noise, like horrible. It was three detectives kicking the doors down. (One of them was Carl Geisler another was Harwood). I screamed and cried. Flashbulbs went off and there I was standing with my baby and the nurse. The next day I asked her husband about it and he said he knew nothing about it. "The detectives told me they were after burglars. They tore out my phone and took my car keys and said the police would come shortly. Then they left. I thought there really were burglars they were after. I waited till daylight, then I walked to a neighbor's and phoned the police.
>
> "(Harwood verifies this story and says it is on this occasion that he first knew Carl Geisler had sold him out to Mary Alice.)
>
> "His story: 'I had left Geisler to watch the house. It was Russell's house and we had permission to enter. Geisler radios me that Mary Alice and some guy had gone to the house and it's time to make the bust. We get to the house and Geisler points out the room he says Mary Alice and the guy are drinking in. We bust in the door. There's Mary Alice alone with the baby and nurse. We look through the house. Nobody. We bust right back out. (A. 76, 77)
>
> \* \* \* \* \*
>
> "Mary Alice, Geisler and Harwood relate that for the next month the child was kept under armed detective guard at Russell's rented house. Mary Alice,

on Life's editorial staff "had no other information [than Chandler's] and sought none, and they necessarily had a high degree of awareness of the probable falsity of the statement." The District Judge's opinion tends to show that he employed a negligence standard in assessing the evidence against defendant, which is an erroneous and improper standard, as we have previously indicated. The Trial Judge's statement that "[t]he conclusion is inescapable that [Billings] and others who worked on the caption had serious doubts as to the truth of the article in its published form" is at odds with the evidence which we have scrutinized to find the clear and convincing proof of knowing or reckless falsehood requisite in this case.[17] The circumstance of Geisler working for Harwood who was employed by Mr. Firestone, and later working for Mrs. Firestone, plaintiff herein, in the same marital litigation has not been explained by plaintiff or her witnesses. Whether or not she procured the "sell out" or Geisler changed sides for some other reason is a matter of conjecture, but a resolution of that question is not necessary to our decision here.

■ Billings and Life's editorial staff had a right under the circumstances to rely on Chandler, who relied on Harwood. There is no evidence in the record which would justify the conclusion that Life knew its caption in the article relating to Mrs. Firestone was untrue or that the editorial staff entertained serious doubts about its truthfulness sufficient to amount to recklessness. Though the Trial Judge so found he did not support his finding with evidentiary facts. We have determined in our own independent *de novo* review of this case that the District Judge decided the case by employing erroneous legal standards and his conclusions are not supported by the record. Under *New York Times* and its progeny, especially *Metromedia,* and the prior decisions of this Court, plaintiff cannot recover under the circumstances presented here.

Reversed.

BELL, Circuit Judge (specially concurring):

I concur in the result reached by Judge Ainsworth that the evidence is insufficient to warrant recovery by plaintiff in this case, and thus in the reversal. My reasons for reaching this result differ, however, in substantial measure from those of Judge Ainsworth. Moreover, I reach the result without the use of the procedural euphuism—a de novo review in the appellate court.

### I.

In New York Times v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the Supreme Court fashioned a procedural technique under the aegis of the

---

all agree, visited the baby daily, crying and begging to be given him. She would use the phone at the rented house and Harwood bugged that phone. *Geisler found the recorder and made his final split with Harwood.* Mary Alice got the baby back. (A. 77, 78)

\* \* \* \* \*

"Last New Year's Eve, her brother Charles Turner notices an unusual amount of wires in the garage adjoining the house. He and Mary Alice telephone Carl *who inspects and finds the tap.*

" 'The batteries were low,' *says Carl,* "so I had Mary Alice telephone several people saying she was going out that night. I figured the tapper would use the opportunity to replace the batteries.

*Charles and Geisler hid in the garage.* Sure enough, in about half an hour this guy comes creeping into the garage. He's got his shoes in his hands. I jump him and call the police. Man, we got him. We got the wiretap equipment and we got the guy in the garage trying to change the batteries. With witnesses.' " (A. 78, 79)

(Emphasis by the Court.)

17. By coincidence the same finding was made by the District Court in *Metromedia* and the Supreme Court held that "there is no evidence in the record to support a conclusion that respondent 'in fact entertained serious doubts as to the truth' of its reports." Id., 403 U.S. at 57, 91 S.Ct. at 1826.

First Amendment to insulate the communications industry from state libel laws. That case involved a libel action brought by a public official against a newspaper. The rule was announced that in such an action, the complainant must meet a standard of proof of convincing clarity that a defamatory falsehood alleged as libelous was uttered with ". . . knowledge that it was false or with reckless disregard of whether it was false or not . . ." 376 U.S. at 280, 84 S.Ct. at 726.

This rule reached its full scope in Rosenbloom v. Metromedia, 1971, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, when it was extended to place the same burden on any citizen if the utterance involved is related to an issue of public or general concern. 403 U.S. at 44, 91 S.Ct. 1811.

Also in Garrison v. Louisiana, 1964, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125, and again in Rosenblatt v. Baer, 1966, 383 U.S. 75, 84, 86 S.Ct. 669, 15 L.Ed.2d 597, both public official cases, the court stated that the holding in New York Times v. Sullivan also establishes that the burden is on the plaintiff in such a case to establish the falsity of the utterance.[1]

Thus, the present rule is that the burden of the plaintiff in a libel action against the news media arising out of a defamatory publication, where a First Amendment defense is asserted, is (a) to establish by clear and convincing proof [2] that (b) the statement was false and (c), that it was published with the knowledge that it was false or with reckless disregard of whether it was false or not.

The Supreme Court has not expressly added the requirement of clear and convincing proof of falsity to the plaintiff's burden of proof. As stated, the burden of showing falsity has been imposed *upon the plaintiff in First Amendment cases. Garrison,* supra; *Rosenblatt,* supra. Such a standard of proof seems implicit however, in the stated requirement in *New York Times* that plaintiff has the burden of showing by clear and convincing proof that publication was

1. This is a departure from the rule that a defamation is presumed to be false with the burden being cast upon the defendant to plead and prove truth. Prosser, Law of Torts, p. 798 (4 Ed., 1971). It is also a departure from the Florida rule. See Miami Herald Publishing Company v. Brautigam, Fla.App., 1961, 127 So.2d 718.

The language used in *Garrison* was as follows:

"We held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true." 379 U.S. at p. 74, 85 S.Ct. at 215.

This can be read as permitting the presumption of falsity from a defamatory statement where the issue is reckless disregard as distinguished from an allegation of actual knowledge of falsity. Indeed, it is difficult to imagine how actual knowledge of falsity could be established without proof of falsity, thus explaining the use of the language in *Garrison*. However, it may be argued that where plaintiff relies on proof of reckless disregard for truth, no proof of actual falsity is necessarily implicit in plaintiff's case. Stated differently, in such a case, proof of falsity is not a logical prerequisite.

The view that Garrison does not intend to abrogate state law by requiring a plaintiff to prove falsity is reinforced by looking to the origin of the quote in New York Times v. Sullivan, supra, 376 U.S. at 279–280, 84 S.Ct. 710. The court does not there or in later cases appear to deal with the question of proving falsity, but rather with what degree of awareness and proof thereof will excuse the publication of a falsity. Absent specific derogation of the state law should be preserved except where in direct conflict with the rule fashioned by the Supreme Court.

However, this narrow reading of the Garrison language should be rejected. Such would hardly comport with the other broad safeguards created in *New York Times* and its progeny to vouchsafe freedom of the press.

2. The language "convincing clarity" in *New York Times*, 376 U.S. at 285–286, 84 S.Ct. 710, was transposed into "clear and convincing" in *Metromedia*, 403 U.S. at 30, 91 S.Ct. 1811.

with knowledge of falsity or with reckless disregard as to falsity *vel non*. I conclude for the same constitutional reasons giving rise to this stringent proof requirement that the clear and convincing proof standard would also apply to proving that the statement was false in the first instance.

Given the rule of *New York Times* with the gloss of *Garrison* and *Rosenblatt*, supra, as extended in *Metromedia*, the questions become first, whether plaintiff sustained her burden of establishing by clear and convincing proof that the published statement in issue was false, and second, whether defendant Time, Inc., acting through its Life Magazine employees, printed the statement with knowledge that it was false or with reckless disregard of whether it was false or not.

Plaintiff, a hapless private citizen, involved in a divorce proceeding with attendant wiretapping activity at the behest of her husband and his private detective-minion, was partially the subject of a Life article on wiretapping where she was charged with getting one of her husband's private detectives "to sell out and work for her." This statement was alleged to be false and defamatory. The article in pertinent part is printed in the margin.[3]

In publishing the article, Life relied entirely on the text of a long telegram from a stringer correspondent, Chandler. The pertinent part of the text is contained in footnote 16 of Judge Ainsworth's opinion. What appears from the text is that Mrs. Firestone "wooed one of Harwood's top investigators, Carl Geisler, to work in her interests." Chandler then quoted Mrs. Firestone as recounting an invasion by Harwood, Geisler and another private detective

into her bedroom, through the medium of kicking the door down. The persons in the bedroom at the time were Mrs. Firestone, her baby and the baby's nurse. Harwood expected to find a man in the house with Mrs. Firestone at the time, and the raid was on the signal of Harwood's lookout, Geisler. Chandler stated in the telegram to Life that Harwood said to him that it was "on this occasion that he first knew that Carl Geisler had sold him out" to Mrs. Firestone.

Life's conduct must be justified on the text of the telegram. The language of the telegram was escalated to some extent in the article but probably not to a prohibited degree. The rub comes from other facts contained in the telegram. There was much to put Life on notice to move cautiously. The description of Harwood's work style was revolting to the point that one might question his credibility. In addition, Chandler drew the conclusion that Harwood had "developed a paranoiac hatred" of Mrs. Firestone. Life made no check with anyone other than Chandler before publishing the statement.

Nevertheless, I do not find it necessary to reach the question whether a fact issue is presented as to reckless disregard on the part of Life. I get no further than the preliminary question whether the proof is clear and convincing that the statement was false. The record will be searched in vain for clear and convincing proof that Mrs. Firestone did not arrange in some manner for the services of Geisler, a former private detective for Mr. Firestone. There is no express denial from Mrs. Firestone of the fact. There is unrefuted evidence that Geisler was working with and under Harwood for Mr. Firestone. There is substantial evidence that he was later

---

3. "TWO-WAY SNOOP. In Florida, where electronic eavesdropping is frequently employed in divorce suits, private eyes like Jack Harwood of Palm Beach, shown above with some of his gear, do a thriving business. Harwood, who boasts, 'I'm a fantastic wire man,' was hired by the tire heir Russell Firestone to keep tabs on his estranged wife, Mary Alice. She in turn got one of Harwood's assistants to sell out and work for her and, says Harwood, 'He plays just as rough with the bugs as I do.' A court recently ordered Russell and Mary Alice to stop spying on each other."

in the service of Mrs. Firestone on some basis.

The district court made no subsidiary findings of fact on falsity. At most, there was an assumption of falsity. As the court stated in New York Times v. Sullivan, 376 U.S. at 284–285, 84 S.Ct. at 728, where the case might have been retried if remanded or reversed, " . . . we deem that considerations of effective judicial administration require us to review the evidence in the present record to determine whether it could constitutionally support a judgment for [plaintiff]."

The record as a whole, including all subsidiary facts that might lend support to the allegation of falsity, is bereft of clear and convincing proof of falsity. There the matter ends.

## II.

I also wish to register disagreement with the new procedure announced by Judge Ainsworth of deciding First Amendment cases de novo. I do not take the use of the term "de novo" for the first time in the plurality opinion in Metromedia (three justices), 403 U.S. at 54, 91 S.Ct. 1811, to establish a new and different standard of review in First Amendment cases from that previously announced by the Supreme Court.

The term "de novo" is not one to be used indiscriminately, given its other uses in procedural law. One ordinarily thinks of a trial de novo when a case is appealed from one trial tribunal to another. Perhaps the most familiar use of the term in the federal courts was in the old admiralty practice where appellate courts reviewed admiralty trials de novo and could take additional proof where indicated. Judge Godbold in Caradelis v. Refineria Panama, S.A., 5 Cir., 1967, 384 F.2d 589, 592–593, discussed this former practice and the abolition of it by the Supreme Court in McAllister v. United States, 1954, 348 U.S. 19, 75 S. Ct. 6, 99 L.Ed. 20, which applied the clearly erroneous principle of Rule 52, Federal Rules of Civil Procedure, to admiralty cases.

When considering the state of records to be reviewed in appellate courts, state and federal, jury and nonjury trials, it becomes apparent that the use of the term "de novo" in Metromedia was one of emphasis—to the end that reviewing courts must carefully consider the facts pertaining to constitutional questions. We do this by making our own careful examination of the record, with particular scrutiny of the underlying or subsidiary facts—to see if the factual conclusions meet the high standard set in New York Times, supra, of finding clear and convincing proof. This is the teaching of New York Times, Metromedia, Time v. Pape, 1971, 401 U.S. 279, 284, 91 S.Ct. 633, 28 L.Ed.2d 45; Edwards v. South Carolina, 1963, 372 U.S. 229, 235, 83 S. Ct. 680, 9 L.Ed.2d 697; Blackburn v. Alabama, 1960, 361 U.S. 199, 205 n.5, 80 S.Ct. 274, 4 L.Ed.2d 242. This leaves the law as a workable institution. A de novo review in the traditional sense would reduce the trial courts to a level below that of a master; they would simply be recorders of the evidence. There would be no one to make credibility choices. We are not told what would be done with jury verdicts nor with the Seventh Amendment. This is not my reading of the plurality opinion in Metromedia.

I hasten to add that Judge Ainsworth has only used the term "de novo" in his review of the record. I neither perceive nor suggest that he would or has ignored credibility findings or the clearly erroneous rule as it applies to underlying or subsidiary facts as distinguished from conclusions of fact.

GODBOLD, Circuit Judge (specially concurring):

I concur in the result reached by Judge Ainsworth, but I am not able to join in all of what he has said. It seems to me that some caveats are necessary.

I agree that the constitutional guaranty now extends to discussion and communication involving "an issue of public or general concern." However, the reach of that term was not an issue in

*Metromedia*, which left the delineation thereof to future cases, Rosenbloom v. Metromedia, 403 U.S. 29 at 44–45, 91 S. Ct. 1811, at 1820, 29 L.Ed.2d 296, at 312 (1971). The plurality opinion in that case recognized that there are areas of a person's activities that fall outside the scope of public or general interest. While I accept that the publication in this case was within the *Metromedia* phraseology, it seems to me important to note that the publisher may not, by mere artful characterization, force into the ambit of the phrase activities otherwise outside of its scope.

Secondly, Judge Ainsworth's opinion chooses as a standard of review "independent de novo review" without definition of what that illusory term means. The phrase alone does not adequately answer the question of the extent to which, in making an independent examination of the record, we give effect or deference to lower court findings. However, the cases relied upon by Justice Brennan, 403 U.S. at 54, 91 S.Ct. 1811, 29 L.Ed.2d at 318, flesh out the term. They seem to me to compel rejection of any implication that review is to exclude a residual deference to lower court findings. Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed. 2d 697, 701–702 (1963), refers to the "duty . . . to make an independent examination of the whole record" [citing footnote 5 of Blackburn v. Alabama, 361 U.S. 199, 205, 80 S.Ct. 274, 4 L.Ed.2d 242, 247 (1960)], but in the sentences immediately preceding, 372 U.S. at 235, 83 S.Ct. 680, 9 L.Ed.2d at 701, *Edwards* recognized that the Supreme Court "may accept . . . as binding" the decision of the state court that the petitioners' conduct constituted breach of the peace under state law.

Footnote 5 of *Blackburn* said this: "It is well established, of course, that although this Court will accord respect to the conclusions of the state courts in cases of this nature, we cannot escape the responsibility of scrutinizing the record ourselves." The footnote supports the statement in text that the Court has accorded to the trial judge's decision "all of the deference . . . which is compatible with our duty to determine constitutional questions." 361 U.S. at 205, 80 S.Ct. at 279, 4 L.Ed.2d at 247. Cited in footnote 5 is Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939), which held that "the conclusions reached by the Supreme Court of Louisiana are entitled to great respect" but that the Court has a duty to make independent inquiry and determination of the disputed facts.

These cases make clear that the newly-employed phrase "de novo" does not mean that the appellate court's duty to make an independent examination of the record is to be pursued in the manner of a plenary new trial.